Adler, Appellant, *v.* Montefiore Hospital
Association of Western Pennsylvania.

Argued March 16, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument re-
fused August 13, 1973.*

*Paul H. Titus,* with him *Kaufman & Kaufman,* for appellant.

*Robert Engel,* with him *Marcus Aaron, II, Alan A. Garfinkel,* and *Berkman, Ruslander, Pohl, Lieber & Engel,* for appellee.

OPINION BY MR. JUSTICE POMEROY, July 2, 1973:

This appeal requires us to decide whether a private physician associated with a public teaching hospital is entitled to render what he considers comprehensive medical treatment to his patients by use of certain hospital facilities and equipment, or whether his claimed right to do so must yield to rules and regulations established by the hospital for its own effective administration, and which forbids such use. We resolve the conflict in favor of the hospital.

Appellant, a physician specializing in cardiology, and a member of the medical staff of appellee, The Montefiore Hospital Association of Western Pennsylvania (herein "Montefiore" or "Hospital"), brought this suit in equity to enjoin the Hospital from denying him the right to perform certain procedures in the Cardiac Catheterization Laboratory (Laboratory) of the Hospital. After trial, the chancellor entered an adjudication denying the requested relief. Exceptions to the findings of fact and conclusions of law were dismissed by a court *en banc,* and a final decree was entered. This appeal followed.

---

* Reporter's Note: On January 7, 1974, the Supreme Court of the United States denied a petition for a writ of certiorari.

We have reiterated time and again the scope of our review in an appeal from a decree in equity following a hearing or trial. As we put it recently in *Cowen v. Krasas*, 438 Pa. 171, 173, 264 A. 2d 628 (1970) : "The scope of our review is clear: A chancellor's findings of fact, when approved by the court *en banc*, have the force and effect of a jury verdict and will not be disturbed on appeal if supported by adequate evidence. Stewart v. Watkins, 427 Pa. 557, 235 A. 2d 604 (1967) ; Girard Trust Bank v. Sweeney, 426 Pa. 324, 231 A. 2d 407 (1967) ; and Kalyvas v. Kalyvas, 371 Pa. 371, 89 A. 2d 819 (1952). However, the chancellor's inferences and the conclusions from the facts as found to exist are always subject to review (Kemp v. Majestic Amusement Co., 427 Pa. 429, 234 A. 2d 846 (1967)), as well as his application of the law." The factual posture of this case has been set out extensively in the findings of fact of the chancellor, which incorporated a lengthy stipulation of facts by the parties. Although appellant filed numerous exceptions to the adjudication, he did not specifically allege that any finding was unsupported by competent evidence; neither does he do so in his brief to this court. Like the court *en banc*, however, we have undertaken an independent review of the record and conclude that the findings of the chancellor, summarized below, are supported by competent evidence.

Appellant is a practicing cardiologist on the active medical staff of Montefiore and of three other Pittsburgh hospitals. In addition, he maintains two private offices in separate sections of the City.[1] Appellee is a

[1] At no time during these proceedings have Dr. Adler's professional qualifications been questioned, nor do we intend by this opinion to reflect adversely on these qualifications. The parties stipulated that before coming to Montefiore in 1963, appellant received his M.D. degree from the University of Pittsburgh in 1957, interned at Montefiore during the year 1957-8, served a residency in internal medicine at Presbyterian Hospital in Pittsburgh from

non-profit hospital corporation organized under the laws of this Commonwealth. Its corporate purpose, as expressed in the articles of incorporation, is the "conducting and operating [of] a hospital and dispensary; and in connection therewith carrying on such educational, philanthropic and scientific activities as are incidental to hospital work. . . ." Pursuant to these goals, the Hospital since 1957 has sought increasingly to integrate its operations into the activities of the University of Pittsburgh School of Medicine, of which it became an affiliate in 1969. The Hospital is also a formal corporate member of the University Health Center.

Under its by-laws, the Hospital is divided into five departments: Medicine, Surgery, Radiology, Anesthesiology, and Pathology, each with its own full-time chief physician who has authority over all departmental activities within the Hospital. The Division of Cardiology and its Laboratory are within the Department of Medicine.

From July 16, 1963 until July 1, 1969 appellant was employed by the Hospital as the part-time, salaried director of its Laboratory. During this same period, he was also on the Active Staff of the Department of Medicine, possessing the same rights and privileges as all other staff physicians, specifically all other staff cardiologists. As director of the Laboratory, appellant was the only cardiologist on the Hospital staff authorized to perform cardiac catheterizations and related procedures, except cardioversions and the installation

---

1958-60, served a residency in cardiology at Mt. Sinai Hospital for the year 1960-61, and was a Research Fellow in cardiology from 1961-63 at the Harvard Medical School. Appellant was certified by the American Board of Internal Medicine in 1964, and again by the same group in 1969 with a sub-speciality in cardiovascular diseases. At all relevant times he has been licensed to practice medicine in Pennsylvania and at the time of trial was the president-elect of the Western Pennsylvania Heart Association.

of pacemakers.[2] Although four other qualified cardiologists were on the staff, all their patients who required catheterizations were referred to appellant.[3]

On July 1, 1969, appellant's employment as part-time director of the Laboratory was terminated, and Dr. Edward Curtiss was hired as his full-time replacement. The establishment of the Laboratory in 1963, its subsequent expansion, and finally its restructuring on a full-time basis in 1969 were part of the evolution of Montefiore from a community hospital to a major teaching institution responsible for the training of medical students, interns and residents.[4] Contemporaneously with these changes, many of the physicians employed on a part-time basis to direct the specialty units and laboratories were replaced with full-time physicians.[5] After the part-time employees were replaced, they were

[2] Cardioversions were performed by other cardiologists; temporary pacemakers were installed by the salaried physician in charge of the Coronary Care Unit on a rotating monthly basis; and installation of permanent pacemakers was the responsibility of the Director of the Laboratory assisted by a thoracic surgeon.

[3] In 1967, when another qualified staff cardiologist orally requested permission to perform the above procedures, the request was refused on appellant's recommendation. Appellant's feeling at that time was that the number of physicians permitted in the Laboratory should be kept to a minimum and that everyone's best interests would be served if he as director, were the only one permitted to perform the procedures.

[4] The chancellor found that from 1962 to the present, students rotating through the Hospital rose from 10 to 110; interns and residents rose from 14 to 40; clinical Fellows from zero to 7; and that at the time of trial, 45% of the students at the University of Pittsburgh School of Medicine received their training in internal medicine at Montefiore, compared to a much smaller percentage seven years earlier.

[5] Those units which, at the time of hearing, were under the charge of full-time heads were renal or kidney, gastroenterology, special hematology, adrenal, thyroid and nuclear medicine, clinical immunology, blood bank, ambulatory services, radioimmunology and cytogenics, and the cardiac catheterization laboratory.

no longer permitted to perform the specialized procedures pertaining to their units, even though they continued to be fully qualified to do so. This was true also with respect to the Laboratory, with the result that appellant was not allowed access to it to perform procedures therein even though such procedures were with respect to his own patients. The prior policy and practice established under Dr. Adler's regime as director was thus continued under Dr. Curtiss' directorship. It is this policy of exclusivity, not his discharge as an employee of the Hospital, which appellant challenges as unlawful.

At the same time that appellant's employment with the Laboratory was terminated, he was hired as the salaried, part-time chief of Montefiore's Coronary Care Unit. On March 1, 1970, he was relieved of these duties for alleged failure to follow hospital rules, attempts to subvert the system, failure to fulfill teaching commitments, and removal of expensive equipment from the premises without authorization. Again, this discharge is not here challenged. Eight months after his replacement as Director of the Laboratory, and during a period when his position with the Coronary Care Unit was in jeopardy, appellant requested a hearing before the Joint Conference Committee of the Hospital, as permitted by the Hospital by-laws, on the ground that his exclusion from the Laboratory amounted to a reduction of privileges.[6] The request was denied.

The chancellor's findings of fact included a finding that "[c]ardiac catheterizations and related procedures are essentially team functions which are complicated

---

[6] Article III, Section V, Subsection 1, of the by-laws of the Hospital provides: "In any case where reappoinment [to the Staff] is not recommended or where reduction of privileges is recommended, the Executive Director shall notify the physician or dentist concerned and he shall be given an opportunity to appear before the Joint Conference Committee."

procedures and require other personnel, usually technicians or nurses, besides the physician actually performing the procedure." Though generally diagnostic in nature, these procedures involve definite risks. Potential complications include, among others, death, serious infections, cardiac complications, and serious bleeding. Because these and less serious side-effects can arise without warning and after the probe has been completed, there is a need for monitoring and close observation for several hours after completion of the procedures.

The chancellor further found that the challenged policy, i.e., permitting only the full-time director of the Laboratory to the exclusion of other qualified cardiologists on the active staff to perform the procedures involved, was an accepted practice in major university-affiliated teaching hospitals. Based upon voluminous expert testimony, he concluded that this practice improves patient care, the teaching program and efficient administration in the following ways: (1) as the procedures are essentially team functions, the members are able to develop a routine as well as a familiarity with the equipment and its utilization by a particular physician; (2) full-time presence at the Hospital by the operator permits optimal patient care because complications can be treated by the physician who performed the procedure; (3) physician competence can be maintained only by the performance of at least three cardiac catheterizations per week, and in a low volume laboratory such as Montefiore's this can be assured only by restricting performance to the full-time director; (4) a full-time physician-director has the extra time necessary to teach effectively the many medical students, interns and residents who utilize the Laboratory as a basic learning tool; (5) scheduling problems are reduced when it is not necessary to attempt to accommodate practitioners on the staff who have outside commit-

ments; (6) procedures should be scheduled when possible in the morning so that the performing physician can be available in the afternoon should complications arise; (7) a full-time director insures that the nonprofessional but essential administrative details of operating a laboratory will be performed by a physician; were the director's volume of procedures reduced by allowing others to perform them, it would be extremely difficult to obtain a qualified cardiologist willing to assume the administrative functions; (8) equipment breakdowns and lack of reliability are minimized by limiting equipment utilization to a single physician; and (9) appellee has a substantial and legitimate interest in insuring the optimal performance of its employees and use of equipment because it is liable for negligently caused injuries.

From the foregoing findings, the chancellor concluded that the challenged policy was related to the purposes and objectives of the Hospital, was reasonable, and therefore did not violate either the due process or equal protection clauses of the Fourteenth Amendment; that appellant was accorded the same rights and privileges as all other staff cardiologists not employed by the Hospital and therefore was not entitled to a hearing either by his contract with the Hospital or under the procedural due process requirements of the Fourteenth Amendment; that the Hospital's policy has not interfered with the patient's right to choose his own physician; and that appellant has not been deprived of any privilege necessary to treat his patients effectively. As indicated at the outset, we agree with the conclusions of the lower court and affirm its decree.

## STATE ACTION

We recognize at the outset that the Fourteenth Amendment of the Constitution of the United States

applies only to "state action" and not to private conduct. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 6 L. Ed. 2d 45 (1961); *Shelley v. Kraemer,* 334 U.S. 1, 92 L. Ed. 1161 (1948); *Civil Rights Cases,* 109 U.S. 3 (1883). In *Burton,* supra, the United States Supreme Court held that essentially private conduct does not do violence to the Fourteenth Amendment (in that case the Equal Protection Clause) unless the state has become involved to some significant extent. The amount of involvement must be measured by the facts of each particular case. The parties in the case at bar stipulated, and the chancellor accepted without question, that "[b]y reason of the affiliation with a state-related university [the University of Pittsburgh] and the financial support from the Commonwealth of Pennsylvania and the Federal Government, MONTEFIORE HOSPITAL is a public institution and the conduct and actions of MONTEFIORE HOSPITAL are 'state actions' within the scope of the Fourteenth Amendment to the Constitution of the United States." Although we do not consider that this legal conclusion to which the parties agreed is necessarily binding on the courts having responsibility to render a decision in this action, we do not consider it necessary to question it in this case. For assuming, without deciding, that the Hospital's policy complained of does constitute state action, we conclude that it does not violate the Fourteenth Amendment.[7] We deem it appropriate, nevertheless, to mention briefly what appear to us to be the relevant aspects

---

[7] While we do not decide today the state action question, we note that the issue is not a simple one. The United States District Court for the Western District of Pennsylvania recently held in a case involving 42 U.S.C. §1983 that the Commonwealth of Pennsylvania was not sufficiently involved in the sex discrimination practices of the University of Pittsburgh, a state-supported institution, to constitute state action. *Braden v. University of Pittsburgh,* 343 F. Supp. 836 (W.D. Pa. 1972).

of the question of when a hospital can be considered to be "public" for purposes of the Fourteenth Amendment.

Under traditional classifications, a hospital has been considered either strictly public or strictly private. This formulation was expressed by the Supreme Court of Vermont thusly: "[A] public hospital is an instrumentality of the state, founded and owned in the public interest, supported by public funds, and governed by those deriving their authority from the state. A private hospital is founded and maintained by private persons or a corporation, a state or municipality having no voice in the management or control of its property or the formation of rules of its government. Edson v. Griffin Hospital, 21 Conn. Sup. 55, 144 A. 2d 341; Levin v. Sinai Hospital of Baltimore City, 186 Md. 174, 46 A. 2d 298; 41 C.J.S. Hospitals §1, p. 332." *Woodard v. Porter Hospital, Inc.,* 125 Vt. 419, 422, 217 A. 2d 37, 39 (1966).

Following the decision in *Burton v. Wilmington Parking Authority,* supra, however, the rigid polarity in this classification has begun to erode as courts increasingly recognize a third category which may be termed "quasi-public". See, *Silver v. Castle Memorial Hospital,* 53 Hawaii 475, 497 P. 2d 564 (1972). Fitting this label are hospitals which, though essentially private under the traditional classification, are marked by either one of two sorts of public characteristics. One of these two varieties is a hospital which receives funds in large measure from public sources and through public solicitation, receives tax benefits by reason of its nonprofit and nonprivate character, and holds a virtual monopoly in the area it serves. *Silver v. Castle Memorial Hospital,* supra; *Greisman v. Newcomb Hospital,* 40 N.J. 389, 192 A. 2d 817 (1963); *Sussman v. Overlook Hospital Assoc.,* 95 N.J. Super. 418, 231 A. 2d 389 (1967); *Woodard v. Porter Hospital, Inc.,* supra. The

other type of "quasi-public" hospital is one which receives construction funds from the federal government and participates generally in the benefits available under the Hill-Burton Act, 42 U.S.C. §291 (1965). *Sams v. Ohio Valley General Hospital Assoc.*, 413 F. 2d 826 (4th Cir. 1969); *Eaton v. Grubbs*, 329 F. 2d 710 (4th Cir. 1964), rejecting the earlier holding of the same court in *Eaton v. Board of Managers, etc.*, 261 F. 2d 521 (4th Cir. 1958), cert. den. 359 U.S. 984, 3 L. Ed. 2d 934; *Simkins v. Moses H. Cone Memorial Hospital*, 323 F. 2d 959 (4th Cir. 1963), cert. den. 376 U.S. 938, 11 L. Ed. 2d 659; *Citta v. Delaware Valley Hospital*, 313 F. Supp. 301 (E.D.Pa. 1970). As the cited cases indicate, this third category of hospital has been held to be sufficiently public in nature so that the "state action" doctrine applies. Thus the actions of such hospitals are subject to judicial review with respect to charges of violation of the Fourteenth Amendment. We think that the trend set by the above decisions is a salutary one.

While it is highly probable that Montefiore does in fact qualify as a "quasi-public" hospital, particularly under the Hill-Burton test, we are foreclosed from making that determination due to the paucity of data in the record (no doubt resulting from the stipulation referred to above). In light of our ultimate disposition of the constitutional issues, however, we will accept the stipulation of the parties that Montefiore is a public hospital.

## SUBSTANTIVE DUE PROCESS

Appellant contends that the challenged practice of the Hospital is unreasonable and unrelated to the objectives sought to be achieved, and therefore violates his right to substantive due process guaranteed by the Fourteenth Amendment. In *Meyer v. Nebraska*, 262

U.S. 390, 67 L. Ed. 1042 (1923), the United States Supreme Court included, within the concept of liberty protected by the Fourteenth Amendment, the right to engage in any of the common occupations of life. "The established doctrine", said the Court, "is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect." 262 U.S. at 399, 400. See also, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 33 L. Ed. 2d 548 (1972); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L. Ed. 2d 796 (1957). By the same token, "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307, 12 L. Ed. 2d 325 (1964). See also, e.g., *Aptheker v. Secretary of State*, 378 U.S. 500, 508, 12 L. Ed. 2d 992, 998 (1964); *Shelton v. Tucker*, 364 U.S. 479, 488, 5 L. Ed. 2d 231, 237 (1960); *Schware*, supra.

Our own decisions have recognized these same limitations on governmental powers: "[A] law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations." *Gambone v. Commonwealth*, 375 Pa. 547, 551, 101 A. 2d 634 (1954). Our most recent exposition of this approach, as a matter of state constitutional law, is to be found in *Pa. State Board of Pharmacy v. Pastor*, 441 Pa. 186, 191-2, 272 A. 2d 487 (1971). While the degree to which

the courts should undertake to review the rationality of legislative enactments is a matter of unending debate and change,[8] we have no hesitancy in viewing the judicial role in the area of hospital administration in the same light as did the Supreme Court of New Jersey in *Greisman v. Newcomb Hospital*, 40 N.J. 389, 403-04, 192 A. 2d 817, 825 (1963). Striking down the denial of staff privileges to a doctor of osteopathic medicine, that court held: "Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnish-

---

[8] Mr. Justice STEWART, concurring in *Roe v. Wade*, 410 U.S. 113 at 167, 35 L. Ed. 2d 147 at 193 (1973), which held the Texas criminal abortion statute unconstitutional, observed: "In 1963, this Court, in Ferguson v. Skrupa, 372 U.S. 726, purported to sound the death knell for the doctrine of substantive due process, a doctrine under which many state laws had in the past been held to violate the Fourteenth Amendment. As Mr. Justice BLACK's opinion for the Court in Skrupa put it: 'We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. (Citation omitted.)' " Viewing the decisions of the United States Supreme Court since *Ferguson v. Skrupa*, supra, particularly *Griswold v. Connecticut*, 381 U.S. 479, 14 L. Ed. 2d 510 (1965), and *Board of Regents v. Roth*, supra, Justice STEWART concluded that substantive due process, and consequently a considerable degree of judicial intervention, is still very much alive. Such a view comports with the philosophy consistently followed by this court: "The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts." *Gambone*, supra, 375 Pa. at 551-2. See, also, *Pa. State Board of Pharmacy v. Pastor*, supra.

ing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked . . . for a reason unrelated to sound hospital standards and not in furtherance of the common good." See also, 40 American Jurisprudence 2d, Hospitals and Asylums, §§8-10.

Returning to the facts of the present case, the record shows that patient care, teaching and efficient administration comprised Montefiore's three main objectives following its affiliation with the University Health Center. The voluminous expert testimony, though conflicting, supported the lower court's conclusion that Montefiore's challenged practice would promote those goals in the nine clearly discernible areas catalogued above, viz: (1) teamwork; (2) physician competence; (3) the treating of complications; (4) teaching; (5) scheduling; (6) assuring morning procedures; (7) administration of the Laboratory; (8) equipment maintenance; and (9) optimal use of manpower and equipment. It followed, said the chancellor, that the Hospital regulation was reasonable and therefore did not offend due process.

Appellant contends, however, that his admitted competence in performing the Laboratory procedures renders the challenged rule invalid, if for no other reason than that it reached too broadly. His argument glosses over the complicated nature of the demands facing the Hospital, i.e., serving not only the needs of appellant and his patients, but those of many other physicians and their patients, as well as the University and its students. While appellant was qualified to provide

*good* service within his own limited field of activity, Montefiore determined that the *best* accommodation of everyone's requirements could be achieved only by limiting the conduct of Laboratory procedures to the full-time director. Were Montefiore to open its Laboratory doors to appellant, it would follow that the same privilege would have to be accorded the other qualified staff cardiologists so requesting, thereby rendering even more difficult the attainment of the Hospital's goals. As the reasonableness of the challenged policy is amply supported by the record, we find no Due Process violation.

What has been said in effect disposes also of appellant's related argument that the rights of his patients to be treated by the physician of their choice have been infringed. This alleged "right" is asserted as one of the personal rights reserved to the people under the Ninth Amendment. See *Griswold v. Connecticut,* 381 U.S. 479, 14 L. Ed. 2d 510 (concurring opinion of Mr. Justice GOLDBERG, 381 U.S. at 492, 493; but see the dissenting opinion of Mr. Justice BLACK, 381 U.S. at 518-521). No representation has been made to us of any dissatisfaction of Dr. Adler's patients with the challenged restriction at the cardiac Laboratory, nor has there been any argument that this appellant has standing to represent his patients as a class in this litigation. Putting those important points aside, however, the record fails to show any impairment of the physician-patient relationship. The task facing a hospital which attempts to provide comprehensive medical services is complex. Under the regulations in force at Montefiore, similar to those of other like hospitals, one's personal physician is not the operator in various areas of diagnosis and care, including radiology, pathology, anesthesiology, the coronary care unit, and the nuclear medicine unit, as well as the Laboratory here in question. To require that the procedures administered in these departments shall be performed by hospi-

tal-designated operators is not to deny the appellant or any other qualified staff physician the right to treat his patient in the hospital, or the corresponding right of a patient to the choice and general services of his own physician. See, *Benell v. City of Virginia,* 258 Minn. 559, 104 N.W. 2d 633 (1960). In short, there is no right of which we are aware that would permit a patient to insist on his own doctor's performance of the procedures conducted in a laboratory or other facility furnished, equipped and staffed by the Hospital.

## EQUAL PROTECTION

Does Montefiore's policy of restricting the access of staff cardiologists to the Laboratory, while permitting staff surgeons unlimited use of the operating rooms, violate the Equal Protection Clause of the Fourteenth Amendment? While the Hospital would justify its exclusionary Laboratory policy on grounds that it promotes patient care, proper teaching, and effective hospital administration, appellant points out that private surgeons on the Hospital staff are permitted to utilize the operating rooms to perform their procedures, many of which involve a higher incidence of risk than those in the Laboratory. This policy as to surgeons, it is argued, has resulted in no noticeable impairment of the Hospital's patient care, its teaching program, or its effective administration.

In *McGowan v. Maryland,* 366 U.S. 420, 425-6, 6 L. Ed. 2d 393, 399 (1961), the Supreme Court said: "Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures

are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. See Kotch v. Board of River Port Pilot Comrs., 330 U.S. 552, 91 L. Ed. 1093, 67 S. Ct. 910; Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 79 L. Ed. 1070, 55 S. Ct. 538; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 55 L. Ed. 369, 31 S. Ct. 337, Ann. Cas. 1912C 160; Atchison, T. & S. F. R. Co. v. Matthews, 174 U.S. 96, 43 L. Ed. 909, 19 S. Ct. 609." Unless a classification is inherently suspect, such as those based on alienage, nationality or race, and thus calls for "close judicial scrutiny", see, e.g., *Graham v. Richardson*, 403 U.S. 365, 372-3, 29 L. Ed. 2d 534 (1971), and cases cited therein, the test remains today whether the challenged policy may reasonably be justified. *Dandridge v. Williams*, 397 U.S. 471, 485, 25 L. Ed. 2d 491 (1970).[9]

---

[9] The language of Mr. Chief Justice BURGER, writing for a unanimous court in *Reed v. Reed*, 404 U.S. 71, 75-76, 30 L. Ed. 2d 225 (1971), viz: "The Equal Protection Clause . . . does . . . deny to states the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " has suggested to one close observer of constitutional trends that perhaps the test of equal protection has become a more stringent one. See Gunther, *In Search of an Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1 (1972). A reading of the separate opinions in *Frontiero v. Richardson*, 411 U.S. 677, 36 L. Ed. 2d 583 (1973), sustaining a challenge to the armed services policy of granting dependency allowances for wives but not husbands, makes clear that the Court does not wish to alter traditional equal protection analysis. But at the same time, agreement cannot be reached whether or not to treat sex classifications as inherently suspect.

Our task, therefore, is to examine the regulation of the Hospital to determine whether the difference in treatment accorded to cardiologists and surgeons is reasonably justified by the pertinent facts. We agree with the lower court that a useful analogy can be drawn with those decisions which have upheld against equal protection attack the maintenance by hospitals of closed radiology (x-ray) departments. The Minnesota Supreme Court upheld such a practice on grounds that it (1) was advocated by the American College of Radiologists as being in the best interests of hospitals, patients, and physicians generally; (2) did not interfere with the right of the qualified physician to treat his patient in the hospital; and (3) was part of the general advancement in medical specialization designed to protect patient safety and the hospital from negligence liability. *Benell v. City of Virginia*, supra. To the same effect, see *Letsch v. Northern San Diego County Hospital District*, 55 Cal. Rptr. 118, 246 Cal. App. 2d 673 (1966); *Blank v. Palo-Alto-Stanford Hospital Center*, 44 Cal. Rptr. 572, 234 Cal. App. 2d 377 (1965).

Appellant points out that the American Heart Association, unlike the American College of Radiologists, does not advocate a closed laboratory facility. We are not certain of the equivalence of the two organizations in regard to the two branches of medicine involved, but in any event do not consider the non-advocacy of the Heart Association in any way determinative. Expert testimony adduced at trial in favor of the full-time director concept, although possibly not as authoritative as the formal recommendation of a professional board, at least shows that a large proportion of cardiologists do favor the practice challenged here. In addition, as with radiology, the performance of procedures within a cardiology laboratory is essentially diagnostic in nature and does not interfere with the right of the physician to prescribe for and treat his patient. Although the

Laboratory procedures are performed only by the Director, a specialist, the physician-staff member in the final analysis controls what is to be done, the interpretation of the tests, and the treatment. Finally, the Hospital's expert evidence underscored the essential differences between x-ray or cardiovascular laboratory procedures, where full-time team functioning is favored, and surgical operations, where they are not. According to Dr. Richard Gorlin, Chief of the Cardiovascular Division and Associate Professor of Medicine at the Peter Bent Brigham Hospital in Boston: "An analogy is often erroneously made with a surgical operating team: during general surgery, however, the number of maneuvers are stylized and set for each team member such as Operating Nurse, and apply to all participating doctors. In a catheterization laboratory the number of technicians, nurses, etc., is multiple and varying in applications—doctor idiosyncrasy is greater including type of equipment and its operation, modes of physiological measurement or of angiographic data retrieval. Furthermore, patient crises are manifold running the gamut from pain and discomfort to cardiac arrest and death." A second expert, Dr. James Leonard, Associate Professor of Medicine and Director of the Cardiology Division of the University of Pittsburgh School of Medicine, testifed that whereas general surgery depends primarily upon the surgeon himself, procedures in a cardiac laboratory, like a "moon shot", are highly dependent upon sophisticated equipment requiring a large team and full-time people to assure quality control for the entire operation. Even in surgical procedures, however, according to Dr. Leonard, the trend is toward full-time teams, due to the increasing use of complicated equipment such as the heart-lung machine.

From what has been said it is clear that in addition to promoting desirable hospital objectives, Montefiore's policies for the Laboratory reasonably treat cardiolo-

gists and surgeons differently. We conclude, therefore, that Dr. Adler has not been denied the equal protection of the law because of the challenged regulation.

## RIGHT TO A HEARING

Appellant next contends that before denying his request to perform procedures in the Laboratory, Montefiore was bound, both by its own by-laws and the due process clause of the Fourteenth Amendment, to afford him a hearing.[10] Significantly, the lower court found that when appellant was permitted to perform procedures in the Laboratory during the period 1963-1969, his authority to do so stemmed solely from his employment position and not from membership on the medical staff of the cardiology department. In fact, no cardiologist other than the director has ever held privileges in the Laboratory. When appellant was replaced as director, therefore, any rights he may have had to a hearing hinged solely on his staff membership (coupled, of course, with his qualifications to perform cardiac catheter procedures).

In its recent decision in *Board of Regents of State Colleges v. Roth,* supra, the United States Supreme Court, faced with a similar due process claim of a nontenured college professor who had been denied reemployment for the following school year, said in pertinent part: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. . . . To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral

---

[10] As we said earlier at p. 66, at no time has appellant challenged the right of the Hospital to discharge him as the part-time employee-director of the Laboratory or contended that he was entitled to a hearing to contest this dismissal.

expectation of it. He must, instead, have a legitimate claim of entitlement to it . . . . Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to their benefits. . . ." 408 U.S. at 576-77, 33 L. Ed. 2d at 561. As in *Board of Regents,* where the teacher's contract supported no possible claim of entitlement to reemployment, so here, appellant's position on the medical staff provides no basis for his claim to Laboratory privileges. His rights to admit patients and to prescribe treatment, and the remainder of the cluster of privileges accorded to all staff members, have in no way been diminished, but remain in all respects equal to those of other staff members. Thus, his claim of the denial of procedural due process is based, in the words of the Supreme Court, on nothing more than a "unilateral expectation" and is devoid of merit.

For similar reasons we reject appellant's claim that Article III, Section V of the Medical Staff By-Laws required a hearing in this case. Subsection 1 of that provision reads: "In any case where reappointment is not recommended or where reduction of privileges is recommended the Executive Director shall notify the physician or dentist concerned and he shall be given an opportunity to appear before the Joint Conference Committee." The by-laws, enacted and approved by the Hospital, are an integral part of the contractual relationship with appellant. See *Berberian v. Lancaster Osteopathic Hospital Association, Inc.,* 395 Pa. 257, 149 A. 2d 456 (1959). But as we said previously, appellant's staff privileges have not been reduced in any way, nor has his reappointment been denied.

Based on the foregoing, we conclude that appellant Adler has not been deprived of any rights guaranteed

by the Federal Constitution or the by-laws of the appellee Hospital. Our decision merely recognizes the difficulty and complexity of the task facing a large hospital attempting to provide comprehensive medical services. Many of the procedures which in the past were performed by a physician of the patient's choice must today be handled by hospital-employed specialists. In light of such developments, the personal desires of persons such as Dr. Adler must yield to reasonable rules and regulations intended alike for the benefit of patients and their doctors, the university and its students, and the hospital and the public it serves. As we have held, the regulations here in question were in fact reasonable.

Decree affirmed. Costs on appellant.

Mr. Justice NIX concurs in the result.

─────────

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

The heart of this controversy, having been virtually ignored by the majority, as it was by the chancellor, compels my dissent. In my view, the superficial conclusions and adjudicative findings of the chancellor, relied upon by the majority, and based upon an avoidance of the true legal issue, lead unavoidably to an erroneous decree.

The determinative issue here is whether a public hospital may deny to the hospitalized patients of a qualified hospital staff cardiologist (see footnote 1, supra at pages 63-4 of the majority opinion)[1] the use, by that cardiologist, of hospital facilities for performing cardiac catheterization diagnoses. The important corollary question involved is whether a public hospital may direct that only its salaried cardiologist shall be per-

─────────

[1] From 1963 until 1969, appellant was the part-time director of the cardiovascular laboratory at Montefiore; as such, he performed *all* cardiac catheterizations at appellee hospital.

mitted to render this highly personalized medical service, to the exclusion of other qualified cardiologists treating private paying patients who have selected their own staff privileged physician-cardiologist.

The majority holds, erroneously in my judgment, that Montefiore Hospital, a concededly public institution, may mandate that the diagnostically significant procedure of cardiac catheterization be performed *only* by its hospital employed cardiologist. This holding sanctions a practice of medicine more inclined to a hospital's cash flow and administrative convenience than to the proper delivery of medical services for hospital patients who have chosen to be under the care of a staff privileged physician of their own choice.

Even if one accepts the chancellor's findings as supported by the record, those findings neither necessitates nor warrant the broad and sweeping denial of privileges imposed upon appellant and the private patients he attends. Appellee's proof indicates that Montefiore Hospital, through its salaried full-time cardiologist, has performed, on the average, only one cardiac catheterization per week. In contrast to this figure, appellant, through uncontradicted testimony, established that his patient load (of which 50%-75% desire to be hospitalized at Montefiore) requires that he perform on the average of four to eight such procedures weekly.[2] In view of these statistics, appellee's refusal to allow Dr. Adler the use of the cardiac catheterization room, *at any and all times,* regardless of the fact that the facility will generally be unused, in my judgment, imposes upon an eminently qualified staff (cardi-

---

[2] The uncontradicted hearing testimony established that as of the date of the hearing, 39 patients (some acquired through referral) of Dr. Adler's were unable to be treated by appellant, due to the cessation of Dr. Adler's privileges to perform cardiovascular procedures at appellee-Hospital.

ologist) physician a restriction that cannot withstand constitutional scrutiny.

As the majority correctly notes, it is by now unquestioned that: ". . . *the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth [and Fourteenth] Amendment[s]*, Dent v. State of West Virginia, 129 U.S. 114, 9 S. Ct. 231, 32 L. Ed. 623; Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S. Ct. 752, 1 L. Ed. 2d 796; Peters v. Hobby, 349 U.S. 331, 352, 75 S. Ct. 790, 800, 99 L. Ed. 1129 (concurring opinion); cf. Slochower v. Board of Higher Education, 350 U.S. 551, 76 S. Ct. 637, 100 L. Ed. 692; Truax v. Raich, 239 U.S. 33, 41, 36 S. Ct. 7, 10, 60 L. Ed. 131; Allgeyer v. State of Louisiana, 165 U.S. 578, 589-590, 17 S. Ct. 427, 431, 41 L. Ed. 832; Powell v. Commonwealth of Pennsylvania, 127 U.S. 678, 684, 8 S. Ct. 992, 995, 1257, 32 L. Ed. 253." *Greene v. McElroy,* 360 U.S. 474, 492, 79 S. Ct. 1400, 1411 (1959) (emphasis added). "A state cannot exclude a person from the practice of law *or from any other occupation* in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment." *Schware,* supra at 238-39, 77 S. Ct. at 756 (emphasis added).

Indeed, the very ". . . essence of the democratic faith is the equal claim of every man to pursue his facilities to the humanly fullest—for his own sake, but no less for the sake of society." Thomas, Felix Frankfurter, Scholar on the Bench 94 (1960).

Although the right to develop one's own talents and to pursue an occupation of choice exists, this right, as all others, is subject to reasonable regulation under appropriate circumstances. Although valid reasons may exist which auger in favor of the regulation of hospital facilities, the restrictions here imposed upon appellant,

so vitally affecting not only his rights but also those of the patients he treats, sweep too broadly in furthering appellee's purported purposes. "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of . . . [governmental] abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S. Ct. 247, 252 (1960) (footnotes omitted). "[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama,* 377 U.S. 288, 307, 84 S. Ct. 1302, 1314 (1964).

In the instant case, the Hospital's "drastic" restriction upon Dr. Adler's right to practice medicine is obviously "unduly harsh . . . [and] oppressive." *Whitney v. California,* 274 U.S. 357, 377, 47 S. Ct. 641, 649 (1927) (BRANDEIS, J., concurring). As a practical matter, appellee has denied appellant the right to *fully* practice his chosen occupation, an occupation which appellant is irrefutably well qualified to pursue. "It is common knowledge that a physician or surgeon who is not permitted to practice his profession in a hospital is as a practical matter denied the right to fully practice his profession. *In this day of advanced medical knowledge and advanced diagnostic techniques, much of what a physician or surgeon must do can only be performed in a hospital. In many instances only a hospital has the facilities necessary for proper diagnosis or treatment." Wyatt v. Tahoe Forest Hospital District,* 174 C.A. 2d 709, 715, 345 P. 2d 93, 97 (1959).

Clearly, "less drastic" means could have, and should have, been employed by appellee to insure that the in-

terests of the students, patients and the hospital administration were accommodated. Here, the factual findings of the chancellor, approved by the majority, can be applied with equal conviction to any surgical hospital procedure, most of which involve a greater chance of death or other serious complication than does cardiac catheterization. (Appellee's own exhibit indicates that in a *1961* study, the mortality rate for cardiac catheterization was only .44%, with most deaths unattributable to the procedure itself, but rather to the severe illness of the patient. Cooperative Study on Cardiac Catheterization, Deaths Related To Cardiac Catheterization, III-17 (1968)). Yet Montefiore has not seen fit to close the doors of its surgical operating rooms to all but its "in-house" surgeons.

Obviously, "patient care" cannot be seriously suggested as the justification for Dr. Adler's total expulsion from the cardiac catheterization facilities of Montefiore Hospital. Appellee readily admits that Dr. Adler is fully qualified and competent to perform the procedures. See Note 1, supra.

As to appellee's contention that only one teaching hospital employed cardiologist can perform *all* catheterization procedures at Montefiore, there has been no allegation that appellant is not a fine teacher. In fact, the contrary appears to be true since appellant holds a clinical teaching appointment from the medical school. More importantly, however, is the fact that appellee has made no showing that every physician on the staff must be an integral part of the teaching program—there exists no just reason why appellant should not be allowed to make use of the cardiac catheterization laboratory at times when teaching procedures are not under way. Obviously, this would result in no inconvenience to the medical school or the hospital. With Montefiore performing, on the average, only one catheterization per week, are there not times when teaching activities are

not being performed in the cardiac catheterization laboratory? One must assume there are. "Under the guise of protecting the public interests [and those of the medical school] . . . [appellee has] impose[d] unusual and unnecessary restrictions upon [a] lawful [occupation]." *Gambone v. Commonwealth*, 375 Pa. 547, 551, 101 A. 2d 634, 637 (1954) (STERN, C. J.) This it may not do, despite the majority's erroneous pronouncement to the contrary.

What the Hospital has done, and what the majority has today approved, is to open ". . . the door to a possible future situation wherein a municipal corporation could indirectly practice medicine by hiring its own doctors to operate a [public] hospital. . . ." *Benell v. City of Virginia*, 258 Minn. 559, 566, 104 N.W. 2d 633, 638 (1960) (GALLAGHER, J., dissenting). No greater infringement of the patient's right of privacy, to be treated by the physician of his or her choice, can be imagined. Cf. *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973); *Doe v. Bolton*, 410 U.S. 179, 199, 93 S. Ct. 739, 751 (1973); *Griswold v. Connecticut*, 381 U.S. 479 493, 85 S. Ct. 1678, 1686 (1965) (GOLDBERG, J., concurring). Under the majority holding, "[P]atients . . . [will be]denied the use [by their own physicians] of the Hospital's modern electronic and mechanical equipment . . . and materials readily available in this Hospital which operates on a large scale and has access to substantial public funds. . . . The physician and patient must forego the doctor-patient relationship so important to both of them." *Foster v. Mobile County Hospital Board*, 398 F. 2d 227, 229 (5th Cir. 1968). See also *Greisman v. Newcomb Hospital*, 40 N.J. 389, 192 A. 2d 817 (1963).

Moreover, in addition to the curtailment of the rights of appellant's patients, he too has suffered an unlawful infringement upon his right to practice medicine. "The [majority sanctioned] refusal of access to . . . [Monte-

fiore] . . . [has] the effect of denying to a licensed doctor qualified to practice . . . [medicine] the right to fully exercise his profession." *Rosner v. Eden Township Hospital District,* 58 C.A. 2d 592, 598, 375 P. 2d 431, 434, 25 Cal. Rptr. 551, 554 (1962). On these issues the majority's error is indeed crucial.

Although Montefiore's actions in restricting the use of its cardiac catheterization facility may well prove profitable for the hospital (in that all patient payments for cardiac catheterizations will go to the Hospital through its salaried full-time cardiologist), its action in denying to appellant, at all times, and under all circumstances, the right to perform cardiac catheterizations on appellant's *private hospitalized patients* is patently unlawful. The Hospital's exclusion of appellant from the cardiac facility broadly stifles appellant's right to practice medicine, when "less drastic" means are obviously available to appellee for the fulfillment of its lawful objectives. Montefiore, as well as the majority, has forgotten that ". . . the nature of a public hospital imposes an actual, although implied, limitation upon the authority of [the Hospital] to [drastically] restrict arbitrarily the use of the hospital by the public, whether physician or patient." *Alpert v. Board of Governors,* 286 App. Div. 542, 547, 145 N.Y.S. 2d 534, 538 (1955). "Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. *But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public.* They must recognize that their powers, . . . are powers in trust which are always to be dealt with as such. While rea-

sonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked . . . to preclude . . . [a doctor from treating his patients] not because of any lack of individual merit, but for a reason . . . not in furtherance of the common good." *Greisman,* supra at 403-04, 192 A. 2d at 825 (emphasis added).

It must be emphasized again that: "[t]he question before the court in the instant case is an important one from the standpoint of the public. In many communities in this state there is only one hospital serving public and private patients alike. It, therefore, does not appear to me that a hospital commission, or hospital board, operating such a public hospital should be able by resolution to deprive the patient of the right to be attended by a doctor of medicine of his own choice, when such doctor is duly licensed and is admittedly a competent and qualified member of the medical staff of such a hospital." *Benell,* supra at 570-71, 104 N.W. 2d at 640.[3]

I dissent.

Mr. Justice MANDERINO joins in this dissenting opinion.

---

[3] Recently, on May 8, 1973, this Court held in *Collins and Suburban Fair Housing, Inc. v. Main Line Board of Realtors,* 452 Pa. 342, 304 A. 2d 493 (1973), that a non-profit corporation (multiple listing service) could not impose stricter limitations on membership and *participation* in the multiple listing service than imposed by the Commonwealth in licensing real estate brokers. Obviously, the unlawful restraint-on-trade implications of *Main Line Board of Realtors,* although untouched by the majority here, have clear applicable relevancy to the proper resolution of the instant controversy.