135 N.J. Super. 393 (1975)
343 A.2d 489
JOSEPH E. GRODJESK AND HERBERT B. DOLINSKY, PLAINTIFFS,
v.
JERSEY CITY MEDICAL CENTER; BOARD OF MANAGERS OF JERSEY CITY MEDICAL CENTER; NEW JERSEY COLLEGE OF MEDICINE AND DENTISTRY IN JERSEY CITY; MARLIN F. TROIANO AND HUERTA C. NEALS, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 16, 1975.
*398 Mr. Ronald J. Riccio for plaintiffs (Messrs. Robinson, Wayne & Greenberg, attorneys).
Mr. Francis X. Hayes for defendants Jersey City Medical Center, Board of Managers of Jersey City Medical Center and Huerta C. Neals.
Ms. Mary Catherine Cuff, Deputy Attorney General, for defendant New Jersey College of Medicine and Dentistry in Jersey City (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
Mr. Lewis M. Holland for defendant Marlin F. Trioano (Messrs. Chasan, Leyner, Holland & Tarrant, attorneys).
KENTZ, J.S.C.
This matter comes before the court on a complaint by the plaintiffs, who are Board-certified oral surgeons.[1] They are engaged in private practice in Jersey City and are members of the staff of the Jersey City Medical Center (Medical Center).
The relief sought by plaintiffs is (1) reinstatement to the Medical Center emergency room rotation schedule (rotation schedule); (2) expungement of a censure by the executive committee of the medical and dental staff of the Medical Center and a remand to the joint conference committee and the credential committee for a hearing; (3) establishment of adequate facilities at the Medical Center for the treatment of oral surgical patients, and (4) access to the dental facilities of the New Jersey Medical College of Medicine and Dentistry.
*399 On motion with consent the complaint was dismissed as against defendant Huerta C. Neals.
A brief statement of background facts is necessary for a full understanding and appreciation of the issues in this case. Plaintiffs are former faculty members of the College of Medicine and Dentistry of New Jersey  New Jersey Dental School (Dental School). Defendant Dental School is an institution of higher education funded by the State of New Jersey and dedicated to the education of surgeons and dentists of graduate and undergraduate levels. Defendant Marlin F. Troiano (Dr. Troiano) is Professor and Chairman of the Department of Oral Surgery, Anesthesiology and Hospital-Dental Services and Assistant Dean for Hospital Affairs as well as Director of the Department of Dentistry and the Medical Center. Defendant Medical Center is a publicly funded hospital devoted to the care of the sick. It has an affiliation agreement with the Dental School whereby the Medical Center serves as a satellite teaching division of the college. Pursuant to this affiliation contract the chairman of each hospital department is subject to approval by the Dental School and in all instances the head of the department must also be a member of the faculty of the college.

I
On July 20, 1973 plaintiffs were advised that their participation on the rotation schedule at the Medical Center was to be terminated since there existed disharmony, mistrust and lack of cooperation between them and Dr. Troiano and his staff. At the trial Dr. Troiano testified that it was also his intention to have more members of the Dental School faculty serve on the rotation schedule in order to have closer supervision over the oral surgery residents.[2]
*400 Plaintiffs seek reinstatement to the rotation schedule and contend that their exclusion from this service and from participation in the training of residents has adversely affected them professionally and has also adversely affected their treatment of their private patients because (a) it has limited their exposure to trauma cases; (b) it has denied them an opportunity for continuing professional education; (c) it has excluded them from an "academic atmosphere"; (d) they are not provided the same degree of assistance during surgery that attending oral surgeons on the rotation schedule are provided, and (e) they are denied an opportunity to perform an ethical obligation. Plaintiffs do not contend that there is any economic loss by reason of their nonparticipation in the rotation schedule, and there is no evidence that it is economically beneficial for an attending oral surgeon to participate in the rotation schedule.
Whether plaintiffs have an absolute right to membership on the rotation schedule presents a novel question of law in this State.
It is a well recognized and often repeated axiom that licensed physicians have no constitutional right to practice their profession in a hospital maintained by a state or political subdivision.[3]Hayman v. Galveston, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927). Acknowledging this general legal proposition, our courts have frequently emphasized that
A hospital may prescribe reasonable rules concerning the qualifications of physicians allowed to practice therein. While the issuance of a license to practice medicine and surgery by the State Board of Examiners evidences the qualifications and the right of the holder thereof to practice within the state, it does not give him the right per se to practice in a municipal institution. [Jacobs v. Martin, 20 N.J. Super. 531, 538 (Ch. Div. 1952)]
*401 Committed to the principle that a physician does not have an absolute right to pursue his practice in a public hospital, courts generally have correlatively recognized that access to public hospital facilities may be indispensable if a physician is to sustain an ongoing private medical practice. In Greisman v. Newcomb Hospital, 40 N.J. 389, 401-402 (1963), our Supreme Court addressed itself to the question of a hospital's power to pass on staff membership applications and concluded that the policy considerations expressed in Falcone v. Middlesex Cty. Medical Soc., 34 N.J. 582 (1961), "appl[ied] with equal strength" to the issue of staff privileges. 40 N.J. at 401. Falcone was an action in lieu of mandamus to compel the Middlesex County Medical Society to admit Dr. Falcone to membership. Holding that the effort of the County Society to apply its unwritten requirement of four years' attendance at a medical college approved by the American Medical Association so as to exclude Dr. Falcone from membership was patently arbitrary and unreasonable and beyond the pale of the law, our Supreme Court observed:
We are here concerned with and therefore deal solely with an organization, membership in which may here, in the language of Trautwein,[4] be viewed as `an economic necessity'; in dealing with such an organization, the court must be particularly alert to the need for truly protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objectives of the organization. [34 N.J. at 592]
Therefore, absent a clear showing of economic impotency, judicial relief designed to compel admission to membership  whether it be in a medical society, hospital or other association or organization  will be withheld. This immutable conclusion is reaffirmed by the concluding language of Falcone:
*402 Through its interrelationships, the County Medical Society possesses, in fact, a virtual monopoly over the use of local hospital facilities. As a result it has power, by excluding Dr. Falcone from membership, to preclude him from successfully continuing in his practice of obstetrics and surgery and to restrict patients who wish to engage him as an obstetrician or surgeon in their freedom of choice of physicians. Public policy strongly dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical professions and the public generally * * *. [Id. at 597]
Attuned to the purport of the aforequoted language, it is not unexpected that the court in Greisman was guided to the conclusion that Dr. Greisman's application for membership on the hospital's courtesy medical staff could not be arbitrarily rejected.
The Newcomb Hospital is the only hospital in the Vineland metropolitan area and it is publicly dedicated * * *. Doctors need hospital facilities and a physician practicing in the metropolitan Vineland area will understandably seek them at the Newcomb Hospital. Furthermore, every patient of his will want the Newcomb Hospital facilities to be readily available. It hardly suffices to say that the patient could enter the hospital under the care of a member of the existing staff, for his personal physician would have no opportunity of participating in his treatment; nor does it suffice to say that there are other hospitals outside the metropolitan Vineland area, for they may be too distant or unsuitable to his needs and desires. All this indicates very pointedly that, while the managing officials have discretionary powers in the selection of the medical staff, those powers are deeply imbedded in public aspects, and are rightly viewed, for policy reasons entirely comparable to those expressed in Falcone, as fiduciary powers to be exercised reasonably and for the public good. [40 N.J. at 402][5]
Surveying nationally the wealth of cases which consider the issue of exclusion of a physician from the use of hospital *403 facilities serves only to reveal a dearth of decisions dealing with the unique demand presented by plaintiffs in the instant case. Case law acknowledges that a physician or surgeon who is not permitted to practice his profession in a hospital is, as a practical matter, denied the right to fully practice his profession since, in this day of advanced medical knowledge and advanced diagnostic techniques, only a hospital has the facilities necessary for proper diagnosis or treatment. Wyatt v. Tahoe Forest Hospital Dist., 174 Cal. App.2d 709, 345 P.2d 93, 97 (D. Ct. App. 1959). However, no case has been found advancing the proposition asserted by plaintiffs that the privilege of an attending staff member to use hospital facilities for treatment of his private patients gives him an enforceable right to treat public emergency patients or to be involved in the hospital's training of resident dentists. To the contrary, there is authority which properly rejects this suggestion.
In Alpert v. Board of Governors of City Hospital, 286 App. Div. 542, 145 N.Y.S.2d 534 (App. Div. 1955), the court was called upon to consider the exclusion of Harry L. Alpert, a duly licensed physician, from using public hospital facilities and from participating as a member of the medical staff in the care and treatment of nonprivate patients. In its delineation of the facts the court noted that "if his [Dr. Alpert's] patients require hospitalization, they must retain another physician. Since the nearest other hospitals are considerably distant, petitioner alleges that his exclusion from the city hospital at Fulton will effectively destroy his practice and deprive him of the right to practice medicine in that area." Id. at 536.
Acknowledging that Dr. Alpert's livelihood was, in fact; jeopardized by his exclusion from access to the hospital facility, the New York appellate tribunal, in a tone reminiscent of Falcone and Greisman, was moved to conclude:
On this record it appears that he is a capable and qualified surgeon who has developed a large practice representing a substantial *404 investment. * * * We conclude that a qualified physician admitted to practice in a public hospital acquires a species of tenure and cannot be capriciously excluded and thereby injured financially and professionally, all without notice and an opportunity to be heard.
It follows that petitioner is entitled to use the facilities of the hospital in the treatment of his own patients. [at 538-539]
As to the privilege of treating nonprivate patients, the court sternly stated in words clearly applicable to the instant case:
The petition also prays for an order that he be reinstated upon the active medical staff. The record contains no showing which would entitle him to such relief. The active staff consists of "those physicians who have been selected to regularly attend patients in the hospital and to whom all such patients shall be assigned." Respondent should have complete freedom of choice in such matters. Petitioner, although entitled to treat his own patients in the hospital, has no right to represent the hospital or to treat patients who have not engaged his services. Appointments to the medical staff are made by the board of governors for a term of one year. Respondent's failure to reappoint him to the staff gives rise to no legal remedy, nor is such reappointment necessary to assure him of the right to use the facilities of the hospital and to treat his own patients therein. That right is subject to no one-year limitation and continues so long as petitioner obeys all reasonable rules and regulations of the board of governors and gives no cause for his removal. This result at the same time controls arbitrary conduct by respondent in matters of public concern, yet gives a free hand to the board of governors with regard to the internal management and organization of the hospital. [at 539]
It is important to note that not only did the absence of economic deprivation influence and shape the court's decision in Alpert as it applied to readmission to the active medical staff but also the court evidenced a determined commitment to shield the managing discretion of hospital officials from administrative intrusion.
In passing, the case of Adler v. Montefiore Hospital Ass'n of W. Pa., 453 Pa. 60, 311 A.2d 634 (Sup. Ct. 1973), cert. den. 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974), provides, by extrapolation, additional insights into the sensitive area of hospital management and physician privileges. In Adler the regulations of a public hospital forbade private *405 physicians, specializing in cardiology, from using certain hospital facilities and equipment for cardiac catheterizations and related procedures, and permitted only the full-time director of the hospital laboratory to perform such procedures. Finding that enforcement of this regulation did not violate due process, equal protection or the right of a patient to be treated by a physician of his choice, the Pennsylvania Supreme Court reasoned:
Were Montefiore to open its Laboratory doors to appellant, it would follow that the same privilege would have to be accorded the other qualified staff cardiologists so requesting, thereby rendering even more difficult the attainment of the Hospital's goals.
* * * The task facing a hospital which attempts to provide comprehensive medical services is complex. Under the regulations in force at Montefiore, similar to those of other like hospitals, one's personal physician is not the operator in various areas of diagnosis and care, including radiology, pathology, anesthesiology, the coronary care unit, and the nuclear medicine unit, as well as the Laboratory here in question. To require that the procedures administered in these departments shall be performed by hospital-designated operators is not to deny the appellant or any other qualified staff physician the right to treat his patient in the hospital, or the corresponding right of a patient to the choice and general services of his own physician. * * *. [311 A.2d at 642]
The procedure for oral surgery patients seen at the Medical Center's emergency room is as follows.
If a patient requiring oral surgical attention is admitted to the emergency room and requests attention by a specific attending oral surgeon, then that oral surgeon is called whether or not he is on the roster of attending oral surgeons participating in the rotation schedule; the patient is then regarded as a private patient of the requested oral surgeon and not as a hospital patient.
At the time of admission, if the patient does not request his or her personal oral surgeon, the patient is first seen by the resident oral surgeon on duty at that time. If the resident on duty needs assistance in making a diagnosis, or in providing treatment, he is required to call a more senior or advanced *406 resident for assistance. If the more advanced resident requires assistance in diagnosis or treatment, he would call either the patient's choice of attending oral surgeon (whether or not a participant in the rotation schedule), or, if the patient expresses no choice or preference, he would call the attending oral surgeon first on call for that month under the rotation schedule. If the attending oral surgeon first on call is unavailable, the schedule provides a second on call for each month who would then be summoned.
If an oral surgery patient seen at the emergency room is admitted to the Medical Center as an inpatient and has indicated no choice or preference of an oral surgeon, the patient is admitted as a patient of the Medical Center (sometimes referred to as a "ward patient") under the care of the attending oral surgeon on call for the month under the rotation schedule.
If an oral surgery patient seen at the emergency room does not require hospitalization, but does require "outpatient" oral surgical care or attention beyond that provided in the emergency room, and if the patient has no personal or private choice of oral surgeon (who would provide such care at his office) or dental care facility (clinic, hospital, etc.), the patient is referred to the dental clinic at the Dental School.
If a patient requiring the attention of an attending oral surgeon makes no personal choice of the one to provide the service, and if the service is provided by an attending oral surgeon on call under the rotation schedule, the patient is a hospital patient and not a private patient of the attending oral surgeon who provides the service.
The emergency room activity is a focal part of the training of residents; an attending oral surgeon not participating in the rotation schedule has direct professional contact with residents only in respect to the care (operative assistance as well as preoperative and postoperative care) of the attending oral surgeon's private patients.
It is undisputed that patients coming to the Medical Center's emergency room may request treatment by any oral *407 surgeon on the Medical Center's attending staff, including treatment by plaintiffs, whether or not the oral surgeon is a participant in the rotation schedule. Therefore, the exclusion of plaintiffs from the rotation schedule does not affect the right of any member of the public to be treated at the Medical Center by either of them, if one of the plaintiffs should be his personal choice of oral surgeon.
There was no evidence to show that plaintiffs are more or less competent and skillful in providing oral surgical care than are those attending oral surgeons participating in the rotation schedule. It cannot be found, therefore, that an oral surgeon on call during a month when (if they were included in the rotation schedule) one of the plaintiffs might otherwise have been on call, would provide any less competent or skillful care than one of the plaintiffs might provide. In my view the nonparticipation of plaintiffs in the rotation schedule cannot be found to adversely affect the care of the Medical Center's patients.
There was no evidence presented which disclosed any express rules or regulations promulgated by the Medical Center concerning participation on the rotation schedule except the general policy and procedure as outlined above.
I conclude that the emergency room facility is not a general hospital facility the use of which all attending staff dentists have an automatic absolute right, except where an emergency room patient requests the services of a particular dentist on the attending staff, in which case such dentist does have without dispute the right to render the necessary services to the patient who selected him. Therefore, plaintiffs' application for reinstatement to the schedule based on an absolute right must be denied.
Although plaintiffs do not have an absolute right to serve on the rotation schedule, it must be determined whether under the circumstances of this case they have a qualified or de facto right, or some species of tenure, to serve in this capacity. See Civil Service Comm'n v. Rife, 128 N.J.L. 503 *408 (Sup. Ct. 1942); Alpert v. Board of Governors of City Hospital, supra, 145 N.Y.S.2d at 538-539.
It is not denied that plaintiffs had a combined total of 25 years of dedicated service on the rotation schedule at the Medical Center. There was no evidence of any professional incompetence on their part, nor was there any proof that their work performance during these years of service was in any way faulty.
It appears that there was and is no hospital rule or policy which precludes an attending oral surgeon from serving on the rotation schedule. Other attending oral surgeons have been retained on the rotation schedule and others are being prepared for this service. As has been pointed out, plaintiffs have been conscientious members of this schedule for many years. Their professional competence is undenied and their work performance unquestioned. They are extremely interested in the type of work resulting from their duties on the rotation schedule and are most desirous of continuing in this service. Furthermore, it would seem that certain educational benefits would inure to plaintiffs through their membership on the rotation schedule, and by this service they would be allowed to fulfill an ethical obligation. This assignment would also afford them a greater exposure to trauma cases.
Considering all of these factors, can plaintiffs at this time be excluded from the rotation schedule without cause or reason? I think not. It would seem to me that basic fairness and equitable principles would dictate that some type of right or tenure to continue in this service would inure to the plaintiffs under all of the circumstances in this case.
It is well settled that the exclusion of an attending staff doctor from the use of a hospital facility to which he has either an absolute or qualified right cannot be arbitrary, unreasonable or capricious. In Jacobs v. Martin, supra, the determinative question was whether or not a doctor's privilege of performing major surgery upon his patients was being arbitrarily denied him. Likewise, in Greisman v. Newcomb *409 Hospital, supra, and Sussman v. Overlook Hospital, 92 N.J. Super. 163 (Ch. Div. 1966), aff'd 95 N.J. Super. 418 (App. Div. 1967), the issue was whether the hospital authorities in the exercise of their administrative discretion acted reasonably.
A determination cannot be found to be arbitrary unless it has no rational basis in fact. Bayshore Sew. Co. v. Dept. of Environm. Protection, 122 N.J. Super. 184 (Ch. Div. 1973).
* * * Arbitrary and capricious action * * * means willful and unreasoning action, without consideration and in disregard of circumstances. Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached. [at 199]
In Flanagan v. Civil Service Dep't, 29 N.J. 1 (1959), it was stated:
If there is any fair argument in support of the course taken or any reasonable ground for difference of opinion among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts by the court as to the wisdom of the administrator's decision do not alter the case. [at 12]
A hospital may, in considering an application for hospital privileges (assuming that participation on the emergency room rotation schedule may be elevated to the same status as the right to use hospital facilities to treat private patients), take into account prospective disharmony because of the applicant's personality. Sussman v. Overlook Hospital, supra, 95, N.J. Super. at 424. This does not mean that an applicant for privileges may be prejudiced or penalized for having criticized the functioning of a hospital with which he has been or is affiliated. A person has a right to disagree with a policy or practice, but he does not have a right to be disagreeable in doing so. Constructive criticism, properly expressed, can be salutory and lead to a betterment *410 of conditions. Destructive criticism can be obnoxious and disruptive of morale and good public relations. Id. at 425.
In order to fully understand and evaluate the reasons why plaintiffs were discharged from the emergency room rotation staff a detailed recitation of the relevant facts is necessary.
[The court here reviewed at length the history of plaintiffs' relationship to Dr. Troiano and the staff.]
In view of the foregoing, Dr. Troiano concluded that there existed disharmony, mistrust and a lack of cooperation between plaintiffs and himself and his staff, and in the best interest of the Medical Center and the emergency room program terminated the services of plaintiffs on the rotation schedule.
In my view the evidence clearly and persuasively supports the basis for the removal of plaintiffs from the rotation schedule. There is sufficient credible evidence of disharmony, mistrust and lack of cooperation among the parties. The evidence discloses personality and temperament clashes and professional jealousy which were all part of the source of the poor relationship between plaintiffs and Dr. Troiano and his staff.
Dr. Troiano, as the Director of the Department of Dentistry at the Medical Center, is charged with the responsibility of maintaining a well-run, smooth operation. Cooperation, harmony and trust are essential ingredients for a successful and efficient operation of the emergency room. To this end the action taken by him in removing plaintiffs from the rotation schedule was not arbitrary or capricious but was reasonable and proper under all of the circumstances. His judgment was the exercise of sound discretion and should not be interfered with by this court, nor should it be substituted for by the judgment of this court. Bayshore Sew. Co. v. Dept. of Env., supra, 122 N.J. Super. at 200. Accordingly, I deny the application of plaintiffs for reinstatement to the rotation schedule.

*411 II
On or about September 11, 1973 plaintiffs were censured by the executive committee of the medical-dental staff of the Medical Center for writing to agencies and persons outside the hospital family before judgment was made by them or their peers and also for use by them of patient records obtained improperly.
The censure came about as the result of plaintiffs' letter to the president of the Medical Center's medical staff charging Dr. Troiano and another with unethically stealing patients and complaining of the 1973 rotation schedule. In their letter plaintiffs requested the appointment of an ad hoc committee with punitive powers to study and evaluate the situation. The ad hoc committee was appointed in accordance with the plaintiffs' request and undertook its study and evaluation. In the course of its investigation the committee learned how plaintiffs had obtained certain records of hospital patients and they also learned of the plaintiffs' letter to the State Board of Dentistry.
Plaintiffs contend that they have been wrongfully censured and as a direct and proximate result thereof have been injured in their business, reputation, profits and professional standing. They seek in this action to have the censure expunged and the matter remanded to the joint conference committee and the credentials committee of the Medical Center for a new hearing consistent with the dictates of due process.
It is undisputed that at no time prior to plaintiffs' censure by the executive committee of the Medical Center were they given notice or an opportunity to be heard. Both notice and an opportunity to be heard were necessary where requisites where a person's good name or reputation are at stake. In Hoberman v. Lock Haven, 377 F. Supp. 1178 (M.D. Pa. 1974), the executive committee of defendant hospital found that plaintiff physician had engaged in improper *412 professional behavior. In recognizing that prior notice and an opportunity to be heard were necessary where charges of professional misconduct are asserted against a doctor, the court stated (at 1185), "[t]he concept of `liberty' within the meaning of the Fourteenth Amendment includes charges against a person that might seriously damage his standing and association in his community. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). * * *"
Dr. Troiano asserts that plaintiffs waived their constitutional right to notice and an opportunity to be heard because they had requested the formation of the ad hoc committee. It is clear from the evidence that the ad hoc committee was not convened to judge the conduct of plaintiffs but to judge the conduct of Dr. Troiano. At the instigation of Dr. Troiano the role of the ad hoc committee, and subsequently the executive committee, was transformed from an investigation of Dr. Troiano into an inquiry regarding plaintiffs. To suggest that plaintiffs waived their constitutional rights by requesting an investigation of Dr. Troiano is totally without merit. The law is clear that courts will "indulge every reasonable presumption against waiver of fundamental constitutional rights." Carnley v. Cochran, 369 U.S. 506, 514, 82 S.Ct. 884, 889, 8 L.Ed.2d 70 (1962); Johnson v. Zerbst, 304 U.S. 458, 464-465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).
The censure by the executive committee has unquestionably damaged plaintiffs' reputation and their professional standing as oral surgeons. Thus, the failure of the executive committee and ad hoc investigative committee to give plaintiffs any indication that they were being considered for censure constitutes a denial of plaintiffs' procedural due process rights. See Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); Williams v. Civil Service Comm'n, 66 N.J. 152 (1974).
*413 Plaintiffs' censure is expunged and this phase of the matter is remanded to the joint conference committee and the credentials committee of the Medical Center for a new hearing consistent with the dictates of due process.

III
Plaintiffs contend that the facilities for treating oral surgical patients at the Medical Center are grossly inadequate and unsuited for providing optimum patient care and demand that the Medical Center establish forthwith facilities for the adequate treatment of oral surgical patients.
Plaintiffs base their demand on the common law fiduciary duty of a hospital to provide facilities for adequate care of its patients. Greisman v. Newcomb Hospital, supra; Sussman v. Overlook Hospital, supra; Davidson v. Youngstown Hospital Ass'n, 19 Ohio App.2d 246, 250 N.E.2d 892 (App. Ct. 1969). Plaintiffs also ground their demand on the constitutional right of a physician on a hospital staff to be provided with adequate facilities for treating his patients. Hathaway v. Worcester City Hospital, 475 F.2d 701, 706 (1 Cir.1973); Rosner v. Eden Tp. Hospital Dist., 58 Cal.2d 592, 25 Cal. Rptr. 551, 375 P. 2d 431, 434 (Sup. Ct. 1962); State Bd. of Medical Examiners v. Weiner, 68 N.J. Super. 468, 495 (App. Div. 1961). Plaintiffs demand for adequate facilities at the Medical Center admittedly is not based on any statutory right.
Judicial support should be given generally to hospital management decisions. Ordinarily, judicial judgments should not override the policies of an institution. However, courts should not be loathe to intervene when there has been a clear violation of the hospital's fiduciary duty to provide proper and adequate facilities for patient care or when there has been a deprivation of the constitutional right of its attending staff members to fully practice their profession. Adler v. Montefiore Hospital Ass'n of W. Pa., supra, *414 311 A.2d at 641. In Davis v. Morristown Memorial Hospital, 106 N.J. Super. 33 (Ch. Div. 1969), the court said:
The test to be applied in determining the validity of the hospital's action * * * is its reasonableness as it relates to "sound hospital standards" in "faithfully furnishing facilities to the members of the medical profession in aid of their service to the public." [at 43]
Dr. Grodjesk testified that the oral surgical facilities at the Medical Center are substantially the same as those at another hospital where he is also an attending member of the staff, and that the facilities at that hospital are adequate. Many of plaintiffs' complaints concerning the Medical Center facilities do not relate to the absence of such facilities in the hospital but the place in the hospital where the facilities are located. There was testimony that certain equipment is not available for use by plaintiffs, but in those instances other methods or devices are at plaintiffs' disposal and are adequate for proper patient care.
Under the circumstances it is my view that the facilities are adequate for proper patient care and that there has been no breach of the fiduciary duty of the Medical Center to the public, nor has there been a violation of plaintiffs' constitutional right. Plaintiffs' demand for better and additional surgical facilities at the Medical Center is without merit and is rejected.

IV
Plaintiffs seek the right to use the oral surgery facilities of the Dental School in treating their private patients because of the alleged inadequacy of the facilities at the Medical Center. Plaintiffs also seek to have the policy excluding them from the use of the Dental School facilities declared null and void. Since it has been decided that the facilities at the Medical Center are adequate, there is no need for the use of the Dental School facilities by plaintiffs. The only remaining issue to be determined is the validity of the Dental *415 School's exclusionary policy. My research discloses that this question has not been decided before in our State.
The Dental School facilities are regularly used by the faculty members to treat patients. Plaintiffs contend that the Dental School has a fiduciary duty, as does any hospital, to use its discretion in allowing access to its facilities in a manner in keeping with the welfare of the public it purports to serve. Adler v. Montefiore Hospital Ass'n. of W. Pa., supra, 311 A. 2d at 641. Plaintiffs further urge that the Dental School may not arbitrarily deny dentists' access to its facilities. It is maintained that the Dental School is subject to the same requirement of reasonableness and fairness as is the Medical Center. The Dental School argues that the exclusion of private practitioners from the use of school facilities is a constitutionally permissible action.
The evidence reveals that the Dental School provides clinic facilities and treatment for dental (including oral surgical) patients primarily for the purpose of educating its students and residents. The Dental School permits its full-time faculty members, including oral surgeons, to use the Dental School's clinical facilities in treating patients. The fees generated by this practice are shared with the Dental School and departments thereof, only a small portion of a fee being retained by the faculty member providing the service. The purpose of the faculty practice program at the Dental School is essentialy twofold. It enables full-time faculty members to retain and improve their professional skills and it assists in recruitment and retention of full-time faculty by enabling them to receive some additional income. Patients treated by full-time faculty members under the faculty practice program are regarded as patients of the Dental School and not as private patients of the faculty member providing the service.
Neither part-time faculty members nor nonfaculty members are generally permitted to use the Dental School facilities in treating private patients. However, Dr. Troiano testified *416 that if a qualified oral surgeon, including one of the plaintiffs, had a bizarre or unusual case presenting special educational interest, he might be permitted to treat such a patient at the Dental School, but only because of the educational value to students and residents and the exposure of faculty members to an unusual case in observing the treatment of such a case.
A physician has no constitutional or natural right to practice his profession in a public institution of medical education. Hayman v. Galveston, supra, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714. In Hayman the hospital in question was a municipal hospital leased and operated by the State Board of Regents for the purpose of medical education. Concerning the physician's claim that exclusion from use of hospital and educational facilities violated due process, the court stated:
But the only protection claimed here is that of appellant's privilege to practice his calling. However extensive that protection may be in other situations, it cannot, we think, be said that all licensed physicians have a constitutional right to practice their profession in a hospital maintained by a state or a political subdivision, the use of which is reserved for purposes of medical instruction. It is not incumbent on the state to maintain a hospital for the private practice of medicine. [at 416-417, 47 S.Ct. at 364]
A number of authorities attest to the continuing validity of Hayman. See Jacobs v. Martin, supra, 20 N.J. Super. at 538; Don v. Okmulgee Memorial Hospital, 443 F.2d 234, 238 (10 Cir.1971); Sosa v. Board of Managers, 437 F.2d 173, 175 (5 Cir.1971); Meredith v. Allen Cty. War Memorial Hosp. Comm'n, 397 F.2d 33, 35 (6 Cir.1968); Adler v. Montefiore Hospital Ass'n of W. Pa., supra. See generally, Annotation, "Exclusion of or Discrimination Against Physician or Surgeon by Hospital," 37 A.L.R.3d 645 (1971).
The Hayman court quickly dismissed the physician's equal protection claim. It should be emphasized that the principal *417 activity of the Hayman medical facility was education. There the court said:
But it is argued that, if some physicians are admitted to practice in the hospital all must be, or there is a denial of the equal protection of the laws. Even assuming that the arbitrary exclusion of some physicians would have that legal consequence in the circumstances of this case, the selection complained of was based upon a classification not arbitrary or unreasonable on its face. * * * In the management of a hospital, quite apart from its use for educational purposes, some choice in methods of treatment would seem inevitable, and a selection based upon a classification having some basis in the exercise of the judgment of the state board whose action is challenged is not a denial of the equal protection of the laws. [273 U.S. at 417, 47 S.Ct. at 364]
In the instant case the Dental School's restrictive policy had been adopted to achieve its objective of providing a thorough and efficient education to dental students. The school can achieve this goal in the most satisfactory manner by adoption of the challenged policy. The policy in question, although restrictive, rests on the clearly reasonable justification of provision of quality education  a goal recognized in Hayman and Adler as the unique responsibility of an institution of medical education. See also, Letsch v. Northern San Diego Cty. Hosp. Dist., 246 Cal. App.2d 673, 55 Cal. Rptr. 118 (D. Ct. App. 1966); Blank v. Palo Alto-Stanford Hosp. Center, 234 Cal. App.2d 377, 44 Cal. Rptr. 572 (D. Ct. App. 1965); Benell v. City of Virginia, 258 Minn. 559, 104 N.W.2d 633 (Sup. Ct. 1960), which upheld against an equal protection attack the maintenance by hospitals of closed radiology departments. The authorities clearly demonstrate that the established policy of the Dental School which bars nonfaculty physicians from use of school facilities does not contravene any constitutional right of plaintiffs.
Plaintiffs further posit their claim of a right to use the facilities of the Dental School on its proximity to the Medical Center and on the fiduciary duty of the Dental School.
*418 N.J.S.A. 18A:64G-2 provides:
The Legislature and Governor of the State of New Jersey hereby find that the establishment and operation of a program of medical and dental education is in the best interest of the State to provide greater numbers of trained medical personnel to assist in the staffing of the hospitals and public institutions and agencies of the State and to prepare greater numbers of students for the general practice of medicine and dentistry, and find, declare and affirm, as a matter of public policy of the State, that it is the responsibility of the State to provide funds necessary to establish and operate such programs of education, in the most economical and efficient manner. * * *
And N.J.S.A. 18A:64G-3 provides:
* * * The exercise by the college of the powers conferred by this act in the presentation and operation of a program of medical and dental education shall be deemed to be public and essential governmental functions necessary for the welfare of the State and the people of New Jersey.
An analysis of the Medical and Dental Education Act of 1970, N.J.S.A. 18A:64G-1 et seq., particularly the above-quoted sections, demonstrates that the principal duty of the Dental School is the education of undergraduate and graduate medical and dental students rather than the delivery of daily, routine health services.
The declared commitment to education rather than practice is not intended to minimize the critical health care needs of aging urban centers, such as Jersey City and Newark. Rather, the emphasis on education represents one means selected by the Legislature to alleviate the presently existing imbalance between demand for adequate medical and dental services and supply of qualified medical and dental personnel. The primary responsibility of the Dental School is to provide for the current and future dental needs of the people of New Jersey through education and research.
A thorough program of dental education must include an extensive clinical program. By necessity, the clinical program requires clinical facilities that will deliver some dental care to area residents. Yet the provision of clinical facilities *419 and the delivery of dental services does not transform an institution dedicated to education and research into an acute care or proprietary health facility. The unique responsibility delegated to the Dental School militates against imposition of the fiduciary duties commonly associated with general hospitals. See Greisman v. Newcomb Hospital and Sussman v. Overlook Hospital Ass'n, supra.
Successful operation of a dental clinical program requires control of the type and volume of cases offered to students. Traditionally, a school's efforts to monitor quantity and quality of cases, to designate clinicians and to formulate academic and clinical programs have served as ample justification to restrict educational facilities to faculty. See Dillard v. Rowland, 520 S.W.2d 81 (Mo. Ct. App. 1974). The access to facilities contemplated by plaintiffs would unquestionably disturb the continuity and quality of dental education in this State. School authorities would ultimately lose control over the type and quantity of cases which comprise a vital portion of the curriculum. The relief sought would clearly have a serious debilitating effect on the ability of the Dental School to fulfill its educational duties.
I find that the policy of excluding attending staff members of the Medical Center from using the Dental School facilities does not violate any constitutional right or any fiduciary duties. Accordingly, I determine that this policy is valid.
Plaintiffs also seek permission to attend lectures and seminars sponsored by the Dental School. While this issue was not set forth as a cause of action in the pleadings or in the pretrial order, the issue was interjected into the case on cross-examination of Dr. Dolinsky. As a result both plaintiffs and defendants have presented all of the facts to the court with respect to this issue which seemingly is a novel one in this State. At the close of the case a motion was made on behalf of plaintiffs requesting the court to decide this issue for the reason that all of the facts were before *420 the court and no prejudice would result to defendants. I am satisfied that this issue was fully presented and argued to the court by all interested parties. Accordingly, I grant the motion and order the amendment of the pleadings and pretrial order to conform to the evidence and arguments asserted during the trial. Tanella v. Rettagliata, 120 N.J. Super. 400, 406 (Cty. D. Ct. 1972).
Dr. Troiano has taken the position that plaintiffs are not permitted to attend lectures and seminars conducted by the Dental School for resident oral surgeons. Plaintiffs seek nothing more than to sit and listen to those lectures and seminars. These programs are designed for the education of resident trainees in oral surgery. They are geared to a level of professional sophistication of trainees but not to fully qualified oral surgeons. The programs are attended by the resident trainees in oral surgery as well as those oral surgeons responsible for the presentation of the specific program. The reason given for the decision not to invite any oral surgeon to attend such program was that active participation in the programs by the residents is essential if they are to benefit. Attendance by oral surgeons not involved in the training of residents tends to discourage active participation by a resident trainee out of fear of making a mistake and appearing foolish before an audience. Furthermore, oral surgeons in attendance at such programs tend to seek an active role and, because of their greater experience and confidence, to dominate the proceedings to the exclusion of the residents. There was also testimony that oral surgeons in attendance at such a program tend, in their participation, to direct the program away from the path intended by those responsible for the program. The testimony further revealed that in the opinion of Dr. Gaston, who has a doctorate in education in addition to being an oral surgeon, it would be disadvantageous to the residents if the programs were attended by any oral surgeon who is not a faculty member or a participant.
*421 The regulation concerning attendance at these programs has a rebuttable presumption of validity. If there is a reasonable difference of opinion concerning the need for, and wisdom of, the regulation, "[s]uch a difference of opinion cannot justify a court in holding that there has been an abuse of administrative discretion." In re Weston, 36 N.J. 258, 264 (1961), cert. den. 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962).
The limitation on attendance at these programs for the training of oral surgery residents is rationally based and supported by the opinion of Dr. Gaston, who is an expert in oral surgery education. Therefore, it cannot be found to be arbitrary and unreasonable and the limitation should not be disturbed by this court. The permission sought by plaintiffs is denied.

VI
Plaintiffs maintain that participation in the rotation schedule determines the degree or extent of assistance provided to them by oral surgery residents in the treatment of their patients at the Medical Center, and they contend that they are not provided with the same assistance by residents as is provided to oral surgeons participating in the rotation schedule.
Plaintiffs assert that the assistance rendered to them by resident oral surgeons at the Medical Center should not be limited, and they seek ancillarily a change in the policy with respect thereto. The evidence indicates that the postgraduate educational or academic function of a hospital concerns the training of interns and residents and is not primarily for the benefit of attending oral surgeons participating in the training as teachers.
There does not seem to be any limitation placed on residents in the pre-operative and post-operative care of patients of attending staff members. Dr. Troiano testified that the residents are restricted only from performing the actual *422 surgery on the staff member's private patients. Plaintiffs urge that this restriction is clearly in violation of the hospital's fiduciary duty to provide the best possible care for its patients. Greisman v. Newcomb Hospital; Sussman v. Overlook Hospital and Falcone v. Middlesex Cty. Medical Soc., all supra. However, there was no evidence to suggest, and it appears unlikely on its face, that patients of a staff member would be benefitted and the quality of their care improved if a resident trainee in oral surgery was permitted to participate directly in the surgery on those patients rather than the staff member. It would appear that staff members are provided full assistance by residents in the treatment of their patients in a way consistent with the best oral surgical care that the staff members are capable of providing.
The present policy limiting the assistance to be furnished by oral surgeon trainees to attending staff members seems to be reasonable and a proper exercise of the policy-making authority of the Medical Center. In my view it is not a breach of any fiduciary duty of the Medical Center to provide the best possible care for its patients. I find no merit in the argument that the present policy with respect to the assistance of residents impairs and has an adverse effect upon the quality of the dental treatment which plaintiffs can provide to their private patients. Therefore, this court will refrain from interfering with this policy decision and the relief sought by the plaintiffs is denied.
Judgment to be submitted in accordance herewith.
NOTES
[1] A board certified oral surgeon is a state licensed dentist who is certified by the American Board of Oral Surgery as a specialist in that field.
[2] Oral surgery residents are dentists in postgraduate training specializing in oral surgery.
[3] Any cases cited herein enunciating holdings relating to doctors (physicians) would equally apply to dentists in the context of this case.
[4] Trautwein v. Harbourt, 40 N.J. Super. 247 (App. Div. 1956), certif. den. 22 N.J. 220 (1956).
[5] See Greisman v. Newcomb Hospital, 76 N.J. Super. 149, 159 (Law Div. 1962), wherein the trial judge concluded: "It is readily apparent, that the plaintiff has been substantially injured by way of economic loss by reason of his exclusion."