**Wendell P. ENGELSTAD, M.D.,**
**Appellant,**

v.

**VIRGINIA MUNICIPAL HOSPITAL and**
**Virginia Hospital Commission,**
**Appellees.**

No. 83–1141.

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1983.

Decided Sept. 29, 1983.

Tyrone P. Bujold, John R. Baumgarth, of Hanft, Fride, O'Brien & Harries, P.A., Duluth, Minn., for appellant Wendell P. Engelstad, M.D.

H. Jeffrey Peterson, of Cape, Peterson & Carey, P.A., Virginia, Minn., for appellees.

Before HEANEY, Circuit Judge, and GIBSON and ROSENN,* Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.

Mr. Wendell Engelstad brought this § 1983 action, claiming that the Virginia Municipal Hospital and the Virginia Hospital Commission[1] ("hospital") violated his constitutional rights by terminating him from his director of the pathology department position without providing him with procedural due process protections as guaranteed by federal law and by the hospital's own bylaws.

After a two-and-one-half day trial on Dr. Engelstad's § 1983 claim, the trial court[2] issued an Order of Judgment against Dr. Engelstad and in favor of the hospital. We affirm the judgment and hold: (1) because Dr. Engelstad's director of pathology position was terminable at the will of the hospital, he had no protectible property interest in continued employment in that position sufficient to invoke procedural due process protections upon his termination; (2) Dr. Engelstad's termination from the director of pathology position did not constitute a reduction or termination of his hospital staff privileges sufficient to trigger a due process hearing under the hospital bylaws, rules, and regulations.

I.

In June 1965, Dr. Engelstad entered into an oral contract with the hospital to provide full-time pathology services at the hospital. At this time, Dr. Engelstad was the only pathologist on the medical staff. Dr. Engelstad was granted staff privileges in anatomical and clinical pathology. Anatomical pathology concerns the laboratory study and analysis of tissue disease, and the structural and functional changes caused by tissue disease. Clinical pathology, a broader field, incorporates various diagnostic and analytical methods, including laboratory functions such as blood storage.

The practice of pathology, whether anatomical or clinical, is basically a laboratory specialty and does not involve direct patient contact. A pathologist's primary function is to advise and aid surgeons and other medical practitioners in their determination of proper surgical or medical treatment of patients. In northern Minnesota, the practice of pathology is primarily a hospital-based function. There appears to be two reasons for this. First, close proximity to a hospital's surgical ward is needed because tissues delivered regularly during surgery must be analyzed quickly. Second, the cost of equipping an adequate private pathology laboratory would be prohibitive. The hospital, however, can achieve significant economies of scale by collecting the myriad of modern pathology technologies into one central pathology laboratory made accessible to all staff pathologists. Accordingly, like most other Minnesota hospitals, the Virginia Hospital retained the professional services of a pathologist (or pathology group), for example Dr. Engelstad, who would use the laboratory provided by the hospital.

In order properly to address Dr. Engelstad's § 1983 claim here, we must identify

* The Honorable Max Rosenn, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

1. The Virginia Municipal Hospital is owned and operated by the City of Virginia, Minnesota. The Virginia Hospital Commission, a corporate body politic established under the city's home rule charter, is the governing body of the hospital. The day-to-day administration of the hospital is reposed in an administrator hired as a salaried employee by the hospital commission.

2. The Honorable Patrick J. McNulty, United States Magistrate, District of Minnesota.

precisely the three separate positions he held at the hospital. First, Dr. Engelstad was a member of the hospital's medical staff and therefore enjoyed certain staff privileges to work in pathology. Generally, staff privileges permit a doctor to use hospital facilities to practice his profession. The preamble to the hospital's medical staff bylaws speaks of staff privileges in terms of the right "to attend patients in the Virginia Municipal Hospital." This would have little application to a pathologist who, as mentioned above, typically has no direct patient contact. Unfortunately, the bylaws do not specifically define the scope of a pathologist's staff privileges, but instead confer that responsibility on the medical staff's executive committee. (Article III, Sec. 5(c); Art. VI, Sec. 1 of hospital bylaws). The bylaws do, however, set forth the kinds of factors the executive committee should consider in determining a doctor's staff privileges. The committee should consider the doctor's training, experience, qualifications, and demonstrated competence in his specialty. The bylaws further provide that whenever a staff member's professional conduct does not meet the hospital's standard, the hospital's administrator or governing body may request that the executive committee take corrective action, including reduction or revocation of the member's staff privileges. However, when the administrator or the governing body seeks to reduce or revoke a doctor's staff privileges, the affected doctor is entitled to a comprehensive due process hearing before the executive committee. (Art. III, Sections 6 and 8 of hospital bylaws). In this case, Dr. Engelstad claims that the hospital reduced his staff privileges without affording him the due process protections set forth in the bylaws.

In addition to his position as a staff member with privileges, Dr. Engelstad was also chief of the department of pathology, a largely figurehead position he assumed from the time he began as the director of pathology in 1965. Dr. Engelstad raises no claim with respect to the termination of his position as to the chief of the department of pathology.

Finally, Dr. Engelstad was the director of the pathology department from 1965 until his termination from that position in 1977. Dr. Engelstad's director's position, an essentially administrative position, arose out of Dr. Engelstad's oral contract with the hospital in 1965 to provide pathology services in return for a percentage of the gross proceeds of the pathology lab. During his stint as director, Dr. Engelstad exercised fairly broad administrative control over the pathology lab—he took on many of the characteristics of an independent contractor. He hired and supervised his own employees, purchased supplies with his own funds, personally paid replacement pathologists during his absence, and handled the lab's bookkeeping. Dr. Engelstad originally received 30% of the lab's gross income, but this percentage was later reduced at the hospital's behest and with Dr. Engelstad's approval.

The hospital served as the financial intermediary between the patients and the pathology lab. It would bill and receive payments from patients for the pathology services rendered, deduct the hospital's share from the gross receipts, pay certain expenses which Dr. Engelstad assumed, including his employees' salaries, and then distribute to Dr. Engelstad his net share. The hospital made no deduction from the net due plaintiff for social security, income taxes, or the public employees' retirement fund.

The parties never agreed upon any particular term during which Dr. Engelstad would remain as director of pathology. Sometime in 1965, Dr. Engelstad submitted a proposed written contract to the hospital, which was never executed. The proposed contract provided for a one-year term as director, which would be automatically renewed annually unless either party gave the other 120 days' notice of termination. The proposed contract did not require any showing of cause before termination. Dr. Engelstad testified that at the time he submitted this proposed contract, he could have been terminated from his position as director pursuant to reasonable notice with-

out cause. There was no evidence that the hospital ever proposed or fostered any understanding that Dr. Engelstad would continue as director as long as he chose or as long as his services were rendered satisfactory. In fact, Dr. Engelstad conceded there was nothing permanent about his director's position.

Under Dr. Engelstad's direction, the pathology laboratory was expanded and improved, providing physicians with better services without greatly increasing costs to patients. Understandably, Dr. Engelstad assumed a large measure of credit for this progress, having invested his time and energy to acquire proficient lab technicians and modern lab equipment. Nevertheless, as is often the case with hospital administrative positions, Dr. Engelstad's directorship was subject to the hospital's ever changing ideas and goals for the development of the pathology department. Dr. Engelstad's problems with the hospital administration began in the early 1970's, sometime after Norman Kaye was hired as hospital administrator. Apparently, Mr. Kaye and Dr. Engelstad had conflicting notions about how the pathology lab should be run. The relationship between Dr. Engelstad and the hospital administration steadily deteriorated over time, finally culminating in the formation of an ad hoc committee in January 1977 to evaluate pathology services at the hospital. The committee, composed of five members of the medical staff, met to discuss deficiencies in the pathology department. Dr. Engelstad and Mr. Kaye were in attendance as "resource members." While acknowledging that the surgical pathology provided by the lab was "very good," the committee recommended, inter alia, that the bacteriology services be upgraded and that the pathologists take more interest in clinical pathology, in staff education programs, and in communicating with other staff members. Following the meeting, Dr. Engelstad took steps to remedy the problem areas.

In March 1977, Dr. Engelstad suffered a coronary thrombosis and underwent by-pass surgery. He returned to duty on August 17, 1977. During Dr. Engelstad's absence, the pathology lab was handled by a staff pathologist, hired by Engelstad, and two other staff pathologists. Also during this time, the hospital administration, specifically Mr. Kaye, retained counsel for purposes of obtaining advice on the appropriate procedure for terminating Dr. Engelstad's contractual relationship with the hospital.

On October 11, 1977, Mr. Kaye wrote Dr. Engelstad a letter, notifying him of the administration's decision to terminate his contract with the hospital, effective ninety days from the date of the letter. The letter did not specify the reason for terminating Dr. Engelstad, but did emphasize that Dr. Engelstad's staff privileges would remain intact. During discovery, the hospital indicated that Dr. Engelstad was terminated because of his conflict with the medical staff and hospital administration, his failure to negotiate a written employment contract, and his refusal to control individuals to whom he had given the authority to function in the hospital. Mr. Kaye testified at trial that the main reason for termination was the hospital's desire to hire a director who would enter into a written contract giving the hospital the authority to control all personnel and financial decisions in the pathology laboratory.

Two years following his discharge, Dr. Engelstad filed this § 1983 suit.

## II.

Dr. Engelstad claims he had a protectible property interest in the director of the pathology department position sufficient to invoke due process protections upon his termination from that position. For Dr. Engelstad to have a due process property interest in the director's position, he must identify some rule or mutually explicit understanding supporting a legitimate claim of entitlement to his continued employment as director, and that he may invoke at a hearing. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). We agree with the trial court's holding that Dr. Engelstad has failed to show a constitutionally protected property interest in his continued employ-

ment as director of the pathology department.

■ Initially, the trial court properly considered Minnesota state law and Dr. Engelstad's contract with the hospital in finding that his director's position was terminable at the will of the hospital. *Bishop v. Wood,* 426 U.S. 341, 344–45, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976). Under Minnesota law, a contract for personal services, whether it be on a year-to-year or indefinite basis, is terminable at the will of either party, absent a contractual understanding on the duration of employment or some consideration provided by the employee in addition to the duties of employment. *Lundeen v. Cozy Cab Mfg. Co.,* 288 Minn. 98, 179 N.W.2d 73, 75 (1970); *Degen v. Investors Diversified Services,* 260 Minn. 424, 110 N.W.2d 863, 866–67 (1961). Here, Dr. Engelstad's director's position was based upon a loose oral contract to provide pathology services in return for a percentage of the proceeds from the lab. Dr. Engelstad was basically an independent contractor, whose contract was terminable at the will of the hospital. The hospital made no assurances, oral or written, and adopted no rule, policy, or practice indicating that Dr. Engelstad's contract would be terminated only upon just cause.[3] The only communication as to the contract's duration was a termination provision contained in the 1965 contract draft submitted by Dr. Engelstad. Although this draft was never executed, it does provide some guidance as to Dr. Engelstad's expectations when he assumed the director's position in 1965. The contract provides:

> This agreement shall be for a term of one (1) year and shall be deemed to be automatically renewed unless terminated in writing by either party hereto at least 120 days prior to the annual renewal date.

This provision reflects Dr. Engelstad's understanding from the outset that his contract was not a lifetime contract, terminable only for cause. In fact, Dr. Engelstad admitted that in 1965, when he submitted the proposed contract, he could be terminated upon reasonable notice.

While conceding that in 1977 the hospital could terminate the contract upon reasonable notice, Dr. Engelstad claims he was entitled to a presentation of just cause for termination because he had invested great time and effort over the years in upgrading the pathology laboratory. However, as Dr. Engelstad admitted at trial, his contract to provide pathology services and to run the pathology laboratory necessarily included the ancillary duty to recommend and implement improvements in pathology services. Furthermore, the hospital neither promulgated nor fostered any understanding that Dr. Engelstad's exemplary efforts over the years converted his terminable-at-will contract into a contract terminable only upon presentation of just cause. Hence, it does not appear that Dr. Engelstad's efforts served as additional consideration for a lifetime contract terminable only upon a presentation of just cause.

Thus, all we have here is Dr. Engelstad's unilateral expectation, based largely on notions of professional courtesy and decency, that he would be presented with just cause for his termination. He has identified no rule, course of conduct between the parties, or practice of the medical profession supporting his claim of entitlement to a presentation of cause for termination. As such, Dr. Engelstad's director's position was terminable at will and therefore, under *Bishop v. Woods,* he had no protected property interest in that position sufficient to trigger a procedural due process hearing. 426 U.S. at 344–47, 96 S.Ct. at 2077–79; *Beitzell v. Jeffrey,* 643 F.2d 870, 874 (1st Cir.1981); *cf., Kyles v. Eastern Nebraska Human Services,* 632 F.2d 57, 60–1 (8th Cir.1980); *Carmi v. Metropolitan St. Louis Sewer District,* 620 F.2d 672, 675–76 (8th Cir.1980).

### III.

The parties agree that under the hospital's bylaws, Dr. Engelstad's clinical privi-

3. As the trial court noted, the prevailing practice among area hospitals is to enter into pathology service contracts that are terminable at will.

leges could be terminated or reduced only if specific due process procedures were followed. The dispute here is whether those staff privileges were reduced or terminated. Dr. Engelstad contends that the termination of his director's position had the practical effect of making his staff privileges meaningless, and that therefore those privileges have been reduced or terminated, triggering the procedural requirements set forth in the bylaws. He claims that the trial court erred in finding that his staff privileges following his directorship termination were coextensive with the privileges of other hospital staff pathologists.

In deciding whether Dr. Engelstad's clinical privileges have been reduced or terminated, we must define staff privileges and then relate those privileges to Dr. Engelstad's termination from his directorship position. Generally, staff privileges permit a doctor to use hospital facilities to practice his medical profession. *See* Note, "Denial of Hospital Staff Privileges: Hearing and Judicial Review," 56 Iowa L.Rev. 1351, 1351–52 (1971); Shapiro, *Law, Medicine and Forensic Science,* 636 (3d Ed.1982). Unfortunately, as Dr. Engelstad points out, the contours of his staff privileges in pathology have never been precisely identified. However, from the hospital bylaws, we can glean the types of factors used to determine a doctor's staff privileges. Staff privileges are basically viewed as a reflection of the measure of proficiency a doctor attains in his medical specialty. For example, the hospital bylaws provide that in determining a doctor's staff privileges and whether such privileges should be renewed, reduced or terminated, the hospital's executive committee should evaluate the doctor's training, experience, qualifications and demonstrated competence in his specialty. (*See* Art. VI, Sec. 2 of bylaws). The bylaws further provide that whenever a staff member's professional or ethical conduct does not meet the hospital's standard, the hospital administration may request corrective action, including reduction or revocation of staff privileges. (Art. III, Sec. 6).

Hence, staff privileges serve to delimit a doctor's authority to practice in the hospital based upon the doctor's overall competence in his particular field(s) of practice. Staff privileges do not establish an employment contract with the hospital. Nor do they guarantee a doctor that his authorized practice in the hospital will have a particular economic value. Rather, the use a doctor makes of his staff privileges depends upon some independent source. In the case of a physician or surgeon, that independent source is typically the operation of his private practice. In the case of a pathologist that source may be some independent contractual arrangement with the hospital to provide pathology services to the hospital. Finally, the use a doctor makes of his staff privileges may be incidentally affected by a host of hospital administrative decisions, wholly unconnected to the doctor's professional competence or ethics. For instance, the hospital may decide, for economic reasons, that it will no longer engage in a particular medical procedure, such as heart transplants. While the practical effect of this decision may decrease the income of a heart surgeon with staff privileges, the hospital has not thereby terminated or reduced his privileges under the bylaws. Indeed, the hospital's decision would have nothing to do with factors relating to a heart surgeon's competence to practice his speciality, factors which typically come into play when staff privileges are reduced or terminated.

■ With this background, we can now address Dr. Engelstad's claim that the termination of his directorship effectively reduced or terminated his staff privileges. Whatever expectation Dr. Engelstad had of earning a particular level of income from his pathology practice was predicated upon his contract to serve as director of pathology, not his staff privileges. Indeed, it was his contract with the hospital that gave economic meaning to the exercise of his staff privileges. However, as discussed above, Dr. Engelstad had no protectible property interest in the continuation of his director's contract sufficient to invoke procedural due process requirements upon termination. We cannot agree that the hospital's bylaws' procedural requirements appli-

cable to termination or reduction of staff privileges should be expanded in this case to give Dr. Engelstad a protectible property interest in his director's position. The by-laws' procedural requirements were intended only to cover cases where a doctor's privileges have been reduced or terminated, which is typically the result of complaints regarding the doctor's professional competence or ethical behavior. Those procedures were not intended to cover cases, like the present one, where the use a doctor can make of his staff privileges has been incidentally affected by the hospital's administrative decision to terminate a personal service contract with the hospital. Dr. Engelstad's staff privileges guaranteed him only the authority, not the wherewithal, to practice his profession. His authority to practice his profession at the hospital has not been reduced or terminated, but remains intact.

The instant case is comparable to *Adler v. Montefiore Hospital Association of Western Pennsylvania,* 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). The plaintiff in that case was employed by the hospital as the director of the hospital's cardiology laboratory. The plaintiff also enjoyed staff privileges. The hospital terminated his director's position, significantly limiting the procedures he was permitted to perform in the cardiology lab. The plaintiff claimed that the hospital bylaws granted him a right to a hearing because his exclusion from the laboratory amounted to a reduction of his staff privileges. In rejecting this claim the *Adler* court said:

[The plaintiff's authority to use the cardiology laboratory] stemmed solely from his employment position and not from membership on the medical staff of the cardiology department.... When appellant was replaced as director, therefore, any rights he may have had to a hearing hinged solely on his staff membership....

. . . .

. . . appellant's position on the medical staff provides no basis for his claim to Laboratory privileges. His rights to ad-mit patients and to prescribe treatment, and the remainder of the cluster of privileges accorded to all staff members, have in no way been diminished, but remain in all respects equal to those of other staff members. Thus, his claim of the denial of procedural due process is based, in the words of the Supreme Court, on nothing more than a "unilateral expectation" and is devoid of merit.

311 A.2d at 644–45. The court accordingly emphasized that the hospital bylaws' provision for a hearing upon reduction of staff privileges was inapplicable because the plaintiff's staff privileges were neither terminated nor reduced. *Id.* at 645.

Similarly, in this case Dr. Engelstad's right to serve as director of pathology stemmed solely from his oral contract with the hospital, not his staff membership. Accordingly, as the *Adler* court did, we must distinguish the termination of a contractually created director's position from the termination or reduction of staff privileges. Conceivably, Dr. Engelstad, like the plaintiff-cardiologist in *Adler,* would make less use of his staff privileges after his director's position was terminated. However, consistent with the logic of *Adler,* we look only to whether Dr. Engelstad's staff privileges have been reduced· or terminated, rather than whether he can make less valuable use of those privileges because of the directorship termination. Because Dr. Engelstad's staff privileges remained intact after his director's position was terminated, he was not entitled to the procedures set forth in the bylaws. *See Harron v. United Hospital Center, Inc.,* 522 F.2d 1133, 1134 (4th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976) (court dismisses as "frivolous" radiologist claim that the hospital's termination of his oral contract amounted to a reduction of his staff privileges, invoking hospital bylaws' procedural requirement.)

In addition to theoretical problems, there are enormous practical problems associated with adopting Dr. Engelstad's expansive interpretation of the hospital bylaws' language: "reduction or termination of staff privileges." Essentially, Dr. Engelstad interprets the bylaws so as to give him a

tenured position as director of pathology which could be terminated only for cause after a due process hearing. Not only would this be at odds with the terms of the parties' oral contract, a contract that was clearly terminable at will, but it would also seriously undermine the hospital's flexibility in making essentially administrative decisions. The choice of a department head is largely an administrative function. The hospital administrator's discretion in discharging this function is generally regarded as essential to the proper and efficient operation of the hospital. The decision to terminate a director's contract is frequently based upon organizational factors having nothing to do with the director's competence to practice his medical profession. For example, the hospital may decide to contract with a group of pathologists, rather than one individual. Also, changes in medical science may make some department directorships obsolete. Finally, as was apparently the case here, the hospital administration may decide that it can no longer effectively work with a particular department head due to conflicting ideas about the way the department should operate. It would seem that the hospital should have the discretion to make this decision without affording the aggrieved director the panoply of due process protections applicable where doctor's staff privileges have been reduced or terminated because of alleged professional incompetence or unethical behavior.

Finally, despite Dr. Engelstad's contention to the contrary, we believe there was evidence supporting the trial judge's finding that Dr. Engelstad's staff privileges following his termination were co-extensive with those of other staff pathologists at the hospital. Dr. Knabe, Dr. Engelstad's successor as director of pathology, testified that Dr. Engelstad told him that he, Dr. Engelstad, had been offered an alternative arrangement to remain as a pathologist at the hospital. Dr. Knabe also testified that, although it may have been impractical for Dr. Engelstad to work independently from the department of pathology, Dr. Knabe could have made some arrangements and worked with Dr. Engelstad.

Norman Kaye, the hospital administrator who terminated Dr. Engelstad's directorship, also testified that on September 21, 1977, he offered Dr. Engelstad the opportunity to become an associate pathologist, a part-time position that later turned into a full-time position. Kaye rather forcefully testified that Dr. Engelstad would have received this position had he applied for it.

Kaye further testified that Dr. Engelstad's staff privileges included the use of the pathology laboratory and that he had access to the laboratory after his directorship was terminated. Dr. Engelstad testified that he thought that he could have used the laboratory after his directorship was terminated, but that he never attempted to do so. He also conceded that he never contacted any doctors to see if they would use his services.

In view of the foregoing trial testimony, we believe there was overwhelming support for the trial court's finding that Dr. Engelstad's staff privileges after his termination were coextensive with those of any other staff pathologists. Dr. Engelstad's termination from his directorship certainly did not foreclose all of his options to make use of his staff privileges. Each party shall bear its own costs.

Judgment affirmed.