James ELBAOR, Plaintiff,

v.

**GRAND PRAIRIE HOSPITAL AUTHORITY, et al.,**
**Defendants.**

Civ. A. No. CA 3–83–0034–G.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 22, 1984.

---

Frank Hill and John L. Robinson, Hill, Heard, O'Neal, Gilstrap & Goetz, Arlington, Tex., for plaintiff.

Wayne Pearson and Larry Hallman, Burford & Ryburn, Dallas, Tex., Philip Dean Phillips, Maples, DeBusk, Phillips & Lollar, Fort Worth, Tex., James S. Vecchio, Arlington, Tex., for defendants.

## MEMORANDUM ORDER

FISH, District Judge.

### Introduction

Since late 1982 friction between the plaintiff, Dr. James Elbaor, and the defendants has resulted in various acts by the

latter that have conditioned or restricted Elbaor's privileges at the defendant hospital. Elbaor claims that the defendants by their actions have violated his right to due process of law under the fourteenth amendment.

This case is before the court on defendants' motion for summary judgment and plaintiff's motion for partial summary judgment. For the reasons stated below, defendants' motion is granted and plaintiff's is denied.

## I. *Factual Background*

James Elbaor is a licensed medical doctor and a board-certified orthopedic surgeon. He has been a member of the medical staff at defendant Dallas/Fort Worth Medical Center—Grand Prairie (the "Hospital") since 1977. Prior to the events forming the basis of this action, Dr. Elbaor's medical staff privileges were last renewed on September 15, 1982, for the year September 1, 1982, through August 31, 1983.

### A. *The Probation Episode*

On November 29, 1982, the Membership, Ethics and Credentials Committee at the Hospital held a special meeting to discuss certain incidents concerning Elbaor. Elbaor attended the meeting at the committee's invitation. At the meeting the committee reviewed two incident reports and a grievance report and asked Elbaor to respond to the reports, which were then shown to him for the first time. Elbaor denied all of the charges in the reports. The meeting resulted in a committee vote to request the Executive Committee to take "corrective action" against Elbaor. The committee chairman made this request in a letter dated November 29, 1982.

Article VIII, section 1, of the Hospital's bylaws provides that when the chairman of a standing committee of the medical staff requests that "corrective action" be taken which could be a reduction or suspension of clinical privileges, the following procedures must be followed: (1) the request shall be forwarded to the chairman of the subject physician's department, (2) who at that time shall appoint an ad hoc investigative committee, (3) which shall report its findings to the Executive Committee within 30 days, (4) but after giving the physician an opportunity for an interview with the ad hoc committee; and (5) at such interview the physician shall be informed of the charges against him and invited to respond to them. No ad hoc committee was created to investigate Elbaor's situation regarding the "corrective action" request.

The Executive Committee convened on December 8, 1982, to consider the request, with Elbaor in attendance. After reviewing the incident and grievance reports and hearing Elbaor's response, the Executive Committee issued to Elbaor a letter of warning dated December 10, 1982, informing him that he had been placed on probation for one year:

> The Committee further directed that as a result of such behavior you receive probationary status for one year. During that year any instances of unprofessional or unethical behavior will be cause for summary suspension of your privileges to practice at the Medical Center.

In a letter dated December 9, 1982, Elbaor requested a due process hearing on the probation action. The defendants denied the request in a letter dated December 20, 1982. The Executive Committee took no further action during Dr. Elbaor's probationary period, and Elbaor's privileges were never suspended. Article VIII, section 2(a), of the Hospital's bylaws is the only provision concerning summary suspension of clinical privileges. The section provides in part as follows:

> [T]he Executive Committee ... shall have the authority, whenever action must be taken immediately in the best interests of patient care in the Medical Center, to suspend summarily all or any portion of the clinical privileges of a practitioner ....

### B. *Removal from Teaching Staff and Emergency Room Call List*

In December of 1982 the resident trainer for orthopedics removed Elbaor from the teaching staff for orthopedic residents.

Elbaor was given no advance notice of this action, was not presented with written charges, and was not offered a hearing. Elbaor had received no special remuneration for his participation in the teaching program.

Then, on May 13, 1983, the Emergency Room Committee removed Elbaor from the emergency room call list for a six-month period for violation of express rules against the insertion of pins in the emergency room. The suspension ended after six months, and Elbaor was reinstated on the call list. Elbaor was given no advance notice of the May 1983 meeting, nor was he provided with written charges against him prior to the meeting.

Elbaor made no request for a hearing on this action. The defendants offered Elbaor a hearing on his suspension from the call list in an unsigned draft of answers to interrogatories dated September 23, 1983, and in signed answers dated October 5, 1983, and received by Elbaor on October 11, 1983. Although Elbaor did not pursue this option, he was reinstated to the call list on November 13, 1983. By a letter dated June 12, 1984, the defendants again removed Elbaor from the emergency room call list, this time for an indefinite period. Elbaor had received no special remuneration for his participation on the emergency room call list.

In April 1984 Elbaor applied for reappointment to the medical staff of Harris Hospital in Bedford, Texas, for the 1984–1985 medical staff year. In response to questions in the application, Elbaor answered that he had been subject to disciplinary action at the Dallas/Fort Worth Medical Center—Grand Prairie and summarized the probation, teaching staff removal, and emergency room call list removal actions. An official at Harris Hospital wrote Elbaor a letter dated August 13, 1984, informing him that Harris Hospital had tabled his request until his dispute with the Dallas/Fort Worth Medical Center was resolved.

II. *Contentions of the Parties*

Elbaor brought this action claiming among other things that the defendants' placing him on probation deprived him of a property or liberty interest in his continued status as a nonprobationary doctor at the hospital and that this deprivation was without procedural or substantive due process. Elbaor further contends that the defendants failed to follow their own policies and procedures in placing him on probation, thereby depriving him of property or liberty without due process. Elbaor also maintains that he had a property or liberty interest in his participation on the teaching staff and the emergency room call list, and that the defendants deprived him of these property or liberty interests without due process of law.

The defendants have moved for summary judgment, in which motion they contend that the probation did not reduce, suspend, or revoke Elbaor's privileges at the hospital and therefore did not infringe any property right or liberty interest requiring constitutional due process. In any event, they argue, due process safeguards were observed in the probation action.

With regard to the removal of Elbaor from the teaching staff, the defendants urge that Elbaor had no recognizable property or liberty interest to be constitutionally protected: that there is no constitutional property right to teach medicine and that Elbaor's teaching was voluntary and uncompensated and his services were not rendered pursuant to any contract or other understanding with the hospital. Finally, the defendants contend that Elbaor's participation in the emergency room call list was voluntary and unremunerated and, therefore, did not constitute a property or liberty interest and that, in any event, Elbaor's failure to request a hearing on the emergency room call list removal actions waived any right to procedural due process.

Elbaor argues in response to the defendants' motion that the terms of his probation subjected him to summary suspension for unspecified reasons ("unprofessional or unethical behavior") which were broader than

those allowed under the Hospital's bylaws ("whenever action must be taken immediately in the best interests of patient care"). Elbaor contends, with respect to his removal from the teaching staff and the emergency room call list, that his participation in both programs conferred economic benefits on him, was terminable only on a showing of good cause, and indeed constituted staff or clinical privileges. Elbaor has also moved for partial summary judgment as to liability on the grounds of recovery pleaded against the defendants.

The defendants have responded to Elbaor's motion by maintaining that Elbaor's participation in the teaching and emergency room call list programs was for an indefinite period of time. According to the defendants, the yearly appointment to the medical staff was merely a condition precedent to Elbaor's participation in these programs and did not automatically renew his position on the teaching staff and call list or entitle him to such participation for the following year. The defendants argue that participation in these two programs is not a staff or clinical privilege and that the teaching program is not designed to benefit the physician but rather to educate residents. The defendants also contend that Elbaor's probationary status did not expose him to summary suspension under circumstances other than those authorized by hospital bylaws.

In Elbaor's reply to the defendants' response to his partial summary judgment motion, Elbaor contends that he did not waive his right to a due process hearing regarding his six-month suspension from emergency room call list privileges. A hearing was not offered until the fifth month of his suspension, which time was too late, Elbaor argues, to be meaningful.

Elbaor could not receive an unbiased hearing before the Executive Committee anyway, he asserts, because he had already filed suit against the Committee.

### III. Probationary Employment Status

The fourteenth amendment prohibits state deprivation of life, liberty, or property except in accordance with the principles of due process. The preliminary question for decision regarding the probation episode is whether the alleged deprivation involved a property or liberty interest.[1] Elbaor contends that the defendants' placing him on temporary probation stigmatized him and altered his employment status, thereby depriving him of a property or liberty interest.

#### A. Deprivation of Property

In order to have a property interest in a particular employment status, a person must have "a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1971). Property interests are created and defined not by the Constitution but "by existing rules or understandings that stem from an independent source such as state law." *Id.; Moore v. Otero*, 557 F.2d 435, 437 (5th Cir.1977). *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), further explains that a benefit may be "property" under the fourteenth amendment "if there are [existing] rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* at 601, 92 S.Ct. at 2699 (citing *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709).

Whether a public employer deprives an employee of a property interest merely by placing the employee on probation is a novel question.[2] It has been held that medical

---

1. "The existence of a legitimate property or liberty interest is prerequisite to the examination of any claimed threat to procedural due process." *Thurston v. Dekle*, 531 F.2d 1264, 1271 (5th Cir.1976), *vacated on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978) (mem.); *see also, e.g., Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Goss v. Lopez*, 419 U.S. 565, 572–73, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975); *Perry v. Sinderman*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

2. On the other hand, there are numerous cases holding that discharge, failure to renew the employment contract, or demotion of an employee may be a denial of a property right. *See Perry*

staff privileges are a property interest for fourteenth amendment purposes where there is an explicit or implicit agreement that privileges are terminable only for cause and pursuant to a hearing, *see Northeast Georgia Radiological Associates v. Tidwell,* 670 F.2d 507, 510–11 (5th Cir.1982), and where removal of privileges "might effectively foreclose ... practicing in the area because of harm to [one's] professional reputation and because of the lack of other [comparable] facilities," *Christhilf v. Annapolis Emergency Hospital Ass'n, Inc.,* 496 F.2d 174, 178 (4th Cir.1974).

■ The court is persuaded by the defendants' argument that, in the absence of an actual reduction, suspension, or revocation of staff privileges, nonprobationary employment status itself is not a property right under the fourteenth amendment. Elbaor neither contends nor presents any evidence that his right to admit and treat patients at the defendant hospital was in any way infringed during the months he was on probation. Therefore, it is undisputed that the probation action did not deprive Elbaor of any recognizable property interest.

### B. Deprivation of Liberty

■ A person establishes a fourteenth amendment liberty interest only by satisfying the "stigma-plus" test of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976): i.e., he must show (1) defamation by a state official (2) in connection with a denial of "a right or status previously recognized by state law." *Id.* at 710–11, 96 S.Ct. at 1164–65.

Although there are no cases on all fours with Elbaor's situation, the case of *Daly v. Sprague,* 675 F.2d 716 (5th Cir.1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 802 (1983), *aff'd after remand,* 747 F.2d 1465 (5th Cir.1984), is close in its facts and offers guidance here. In that case the plaintiff was a tenured professor at a medical school. The plaintiff's supervisor removed the plaintiff's clinical privileges as a faculty member but reinstated his privileges three weeks later.

The court affirmed summary judgment for the defendants because the plaintiff had shown no property right in the clinical privileges. The record was devoid of "any facts to establish the nature of Daly's clinical privileges as they related to his tenure or to a contract with the Medical School or to *any* written or oral agreement with the Medical School." *Id.* at 727 (emphasis in original).

Then, analyzing the plaintiff's liberty interest claim under the *Paul* "stigma-plus" test, the court held that the plaintiff failed to satisfy the second prong of the test:

> While some actions could be so devastating as to amount to a "loss of employment" and implicate a liberty interest, [*Moore v. Otero,* 557 F.2d 435, 438 (5th Cir.1977) ], Daly simply did not allege facts to show that such a drastic change in status occurred in his situation. His privileges were removed after he indicated he would be unavailable; he did not, however, suffer loss of employment; he was still a tenured professor; on his return from voluntary leave his privileges were quickly restored. Any alleged damage to reputation because Daly could not see patients or because he would be forced to reveal the temporary loss of privileges does not implicate a liberty interest.

*Id.* at 728.

■ The essence of the "plus" that Elbaor asserts in his liberty deprivation claim

*v. Sinderman,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972) (nonrenewal of contract); *Bueno v. City of Donna,* 714 F.2d 484, 492 (5th Cir.1983) (discharge); *Conley v. Board of Trustees of Grenada County Hospital,* 707 F.2d 175, 181 (5th Cir.1983) (discharge); *Daly v. Sprague,* 675 F.2d 716, 727 (5th Cir. 1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 802 (1983), *aff'd after remand,* 742 F.2d 896 (5th Cir.1984), (removal of medical staff privileges); *Northeast Georgia Radiological Associates v. Tidwell,* 670 F.2d 507, 511 (5th Cir.1982) (removal of medical staff privileges); *Glenn v. Newman,* 614 F.2d 467, 471 (5th Cir. 1980) (discharge); *Roane v. Callisburg Independent School District,* 511 F.2d 633, 637–38 (5th Cir.1975) (discharge); *Johnson v. San Jacinto Junior College,* 498 F.Supp. 555, 568 (S.D.Tex. 1980) (demotion).

is that his employment status was altered because the probation subjected him to closer scrutiny and attenuated his protection from summary suspension.[3] Defendants dispute in their summary judgment papers the assertion that the terms of Elbaor's probation were a relaxation of the summary suspension rules.

However, even assuming that the probation letter was not merely a warning and that it did make Elbaor's continued employment security more precarious, this showing alone is insufficient to support an issue of deprivation of liberty. The kind of probation imposed here is not a "drastic change in status" as required in *Daly v. Sprague*, 675 F.2d at 278.

Certainly a more severe action was taken in *Moore v. Otero*, 557 F.2d 435 (5th Cir. 1977). In that case the plaintiff police officer was transferred from corporal duties to patrol officer duties, and a report was filed stating that he had failed to respond to another officer's call for aid. Affirming the trial court's granting of summary judgment for the defendants, the Fifth Circuit held that there was no deprivation of liberty:

Assuming that the report and the assignment stigmatized Moore, his retention of employment negates his claim that he was denied a "liberty."

\* \* \* \* \* \*

When an employee retains his position even after being defamed by a public official, the only claim of stigma he has derives from the injury to his reputation, an interest that *Paul* reveals does not rise to the level of a liberty interest. The internal transfer of an employee, unless it constitutes such a change of status as to be regarded essentially as a loss of employment, does not provide the additional loss of a tangible interest necessary to give rise to a liberty interest meriting protection under the due process clause of the fourteenth amendment.

*Id.* at 438.

Elbaor, like the plaintiff in *Moore*, maintained his employment after the alleged stigmatizing defamation. There was no showing of a change in his status that was so drastic as to amount to a loss of employment. Therefore, there is no genuine issue of fact to support Elbaor's claim of denial of a liberty under the fourteenth amendment.[4]

## IV. *Removal from Teaching Staff and Emergency Room Call List*

The parties submit contrasting theories as to the nature of the plaintiff's teaching staff and emergency room call list privileges. The defendants contend that Elbaor had no recognizable property or liberty interest because his teaching and emergency room services were voluntary, uncompensated, and noncontractual. Elbaor argues that he has a property or liberty interest because his participation in both programs (1) was terminable only for good cause, (2)

3. Elbaor submits that the broadened scope of summary suspension power is evident from a comparison of language in article VIII, section 2a, of the Medical Staff Bylaws ("whenever action must be taken immediately in the best interest of patient care") with language in the December 10, 1982, letter advising Elbaor of the probation action ("any instances of unprofessional or unethical behavior will be cause for summary suspension").

4. Elbaor also argues that a section 1983 liberty interest claim passes summary judgment examination if there is evidence that the alleged stigmatizing action creates the probability that he will lose future employment prospects. This argument is just another way of saying that Elbaor will probably suffer future injury because of the alleged defamation to his reputa-

tion. In *Daly v. Sprague*, 675 F.2d 716, the Fifth Circuit faced the same argument and held that mere injury to future employment prospects was not enough to implicate a liberty interest. "[W]hen there is no loss of employment or showing of the possibility of *foreclosure* from future employment, no *Goss* [*v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975),] liberty interest is implicated." *Id.* at 728 n. 13 (emphasis added). Elbaor has not shown any possibility of *foreclosure* from future employment. Any damages he may suffer in the form of lost employment opportunities—short of foreclosure from employment—may be recoverable in an action based on Texas tort law but not in an action under the fourteenth amendment and section 1983. *See Paul v. Davis,* 424 U.S. at 711–12, 96 S.Ct. at 1165.

was in fact part of his clinical privileges, or (3) yielded economic benefits to him.

■ Elbaor's first argument, that there was a mutually explicit understanding that his participation was terminable only for good cause, is a proper statement of a property right recognizable under the fourteenth amendment. Even probationary employees have a property interest in their continued employment if the employer has a published policy of discharging only for good cause. *Bueno v. City of Donna,* 714 F.2d 484, 492 (5th Cir.1983).

■ Elbaor's summary judgment evidence utterly fails, however, to show that there was a mutually explicit understanding that the Hospital would remove doctors from the teaching staff and the call list only for cause. Elbaor cites various passages from depositions where one of the defendants testified that it was his "understanding" (1) that members of the teaching staff were entitled to continue to serve until good cause for termination was shown and (2) that doctors on the emergency room call list could stay on the list until there was good cause for removal.

Yet there is no evidence that such policies had ever been formally adopted or that they had been communicated in any form to Elbaor. *See Engelstad v. Virginia Municipal Hospital,* 718 F.2d 262, 266 (8th Cir.1983) (position as director of pathology at a hospital not a property interest where there were no oral or written assurances or adopted rules, policies, or practices indicating that removal could be only for good cause). Elbaor has failed to show "a legitimate claim of entitlement" to continued participation in the teaching program and on the emergency room call list. *See Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 (person must have legitimate claim of entitlement to benefit in order to have property interest therein).

■ Elbaor's contention that participation on the teaching staff and the emergency room call list was part of his staff privileges is a closer question of law. Nevertheless, the court is persuaded by the analysis in *Englestad v. Virginia Municipal Hospital,* 718 F.2d 262, a factually analogous case, that the teaching staff and emergency room call list privileges are not staff privileges.

In *Englestad* the plaintiff and the defendant hospital had an oral contract granting plaintiff staff privileges and under which he was to provide pathology services at the hospital. In addition to his position as a medical staff member, the plaintiff had the title of chief of the department of pathology—"a largely figurehead position" (*id.* at 264)—and was the director of the pathology department. As director, the plaintiff had such administrative duties as keeping the department's books and hiring and firing employees. The director's position arose out of the same oral contract in which the plaintiff undertook to provide pathology services. In this contract the parties never agreed on any particular length of time during which the plaintiff would remain a director, nor did the contract require cause for termination. The plaintiff brought a section 1983 action claiming denial of procedural due process two years after the hospital notified him by letter that it was terminating his contract but leaving his staff privileges intact.

The Eighth Circuit affirmed the trial court in holding that the plaintiff had no constitutionally protected property interest in his continued status as director of the pathology department. *Id.* at 265–66. The court noted that the oral contract on which the director position was based was a personal services contract with an indefinite term and cited state law to the effect that such contracts are terminable at will. *Id.* at 266. The court also observed, as a further basis of its holding, that "[t]he hospital made no assurances, oral or written, and adopted no rule, policy, or practice indicating that Dr. Englestad's contract would be terminable only upon just cause." *Id.*

In addition, the court rejected the plaintiff's contention that the termination of his contract reduced or terminated his staff privileges:

Generally, staff privileges permit a doctor to use hospital facilities to practice his medical profession.

\* \* \* \* \* \*

We cannot agree that the hospital's bylaws' procedural requirements applicable to termination or reduction of staff privileges should be expanded in this case to give Dr. Englestad a protectible property interest in his director's position .... Dr. Englestad's staff privileges guaranteed him only the authority, not the wherewithal, to practice his profession. His authority to practice his profession at the hospital has not been reduced or terminated, but remains intact.

*Id.* at 267–268.

This court agrees with the *Englestad* analysis that staff or clinical privileges are those privileges which are directly related to the practice of the medical profession. Elbaor's teaching staff and emergency room call list privileges were independent of his privileges to practice medicine at the Hospital; therefore, the Hospital's bylaws restricting its power to summarily suspend clinical privileges should not be read to apply to Elbaor's participation in those programs.

Elbaor also argues that because he derived economic benefits from being on the teaching staff (in that residents and interns performed tasks that otherwise would fall to the physician) and the emergency room call list (in that the physician would receive new patients by assignment), he therefore holds a protectible property interest in both programs.[5] Because, however, he fails to show any "rules or understandings that secure" these benefits, *see Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, this contention too

fails to raise a question of fact as to whether the Hospital violated Elbaor's due process rights.

### Conclusion

For the foregoing reasons the court finds that there is no genuine issue as to any material fact in this action and that the defendants are entitled to summary judgment as a matter of law. Accordingly, defendants' motion for summary judgment is GRANTED, and plaintiff's motion for partial summary judgment is DENIED.[6]

---

5. The court in *Englestad* touched on the issue of economic value in a similar context. That court noted that the mere fact that the plaintiff pathologist derived economic value from his directorship position in conjunction with his privileges to practice medicine in the defendant hospital did not mean that he could claim the directorship as part of his staff privileges:

 [Staff privileges do not] guarantee a doctor that his authorized practice in the hospital will have a particular economic value. Rath-

er, the use a doctor makes of his staff privileges depends on some independent source. In the case of a physician or surgeon, that independent source is typically the operation of his private practice.

*Englestad,* 718 F.2d at 267.

6. In view of the court's determination that Elbaor is not entitled to any relief on the merits, his motion for preliminary injunction must also be denied.